WESTERN UNION TEL. CO. et al. v. AMERICAN BELL TEL. CO.

(Circuit Court, D. Massachusetts. December 21, 1900.)

No. 949.

1 REFERENCE—EFFECT OF FINDINGS.

Where by consent of parties a case is referred to a master to hear and decide the issues and report his findings both of fact and of law, such findings are to be taken as presumptively correct, and will not be disturbed unless for manifest error in the consideration given to the evidence, or in the application of the law.

2. CONTRACTS—CONSTRUCTION—EVIDENCE TO EXPLAIN MEANING OF LANGUAGE USED.

Where the language of a written contract is capable of two interpretations, and doubt exists as to its true meaning, evidence of previous negotiations and of surrounding facts and circumstances relating to the subject-matter of the contract is admissible in order to reach an inter-

pretation in accordance with the understanding of the parties at the time. the contract was made.

**3.  SAME—CONSTRUCTION—RENTALS OR ROYALTIES FROM TELEPHONES.**

Plaintiffs and defendant, each of whom owned patents relating to telephones, which were in litigation between them, made a settlement, and entered into a contract by which defendant was granted an exclusive license to use all the patents of plaintiffs, and agreed to pay them upon all telephones used in the United States under license from it, "express or implied, unless expressly excepted, a royalty or bonus of twenty per cent. of all rentals or royalties actually received or rated as paid, in accordance with the provisions of this contract, from licenses or leases for speaking telephones, exclusive of call bells, batteries, wires, and other appliances, or services furnished or performed." The contract stated the then recognized "standard" annual rentals or royalties for each telephone, which was subject to commissions, and provided the commissions which might be paid therefrom, and the minimum rentals which might be charged, without a special agreement of the parties. It required defendant to keep accounts of the number of telephones manufactured, licensed, and put out for use, and of the rentals received and commissions paid, and provided that, where exchanges were conducted by defendant or other corporations in which it was interested, the usual rentals on the telephones used should be "rated as paid," within the meaning of the contract. Subsequently defendant adopted the plan of selling a perpetual license to use its instruments in a certain territory to a local company, taking in payment stock of the company; and in such cases the company paid the usual rentals on the telephones used, less the usual commissions. *Held,* that the term "rentals or royalties," used in the contract, did not include the general profits which defendant might make from the monopoly given by its patents, either by conducting exchanges itself, or from licenses granted to others therefor, but was intended to cover only rentals from instruments, as specified and defined in the contract, which by the recognized custom were rented, and not sold, and that defendant was not entitled to any portion of the stock received from the sale of such licenses.

In Equity.  On exceptions to master's report.

John F. Dillon, Josiah H. Benton, Jr., and Rush Taggart, for complainants.

Richard Olney, John C. Gray, and Charles H. Swan, for defendant.

COLT, Circuit Judge.  Under a contract dated November 10, 1879, the defendant, then known as the National Bell Telephone Company, agreed to pay to the plaintiffs, represented by the Western Union Telegraph Company, 20 per cent. of all rentals or royalties received from licenses for telephones in the United States.  The Bell Company issued licenses to sundry corporations, and received, in addition to the annual rentals for telephones, 35 per cent. of the capital stock of these corporations.  The plaintiffs claim that this stock was "rentals or royalties," within the meaning of the contract, and that they are entitled to 20 per cent. of the stock and the dividends declared thereon.  The defendant maintains that the "rentals or royalties" mentioned in the contract are the standard annual rentals, less commissions, and nothing more; that it had the exclusive right under the contract to carry on the exchange business and to receive the profits, or to license another corporation to carry it on, receiving from such licensee a share of the profits; that this stock, in other words, merely represents the outcome of the mode adopted for realizing its share of the profits of the exchange business.  The case was

referred to a master, who found in favor of the defendant. The present hearing was had on the plaintiffs' exceptions to the master's report. The order of reference was as follows:

"And now, to wit, May 28, 1886, upon agreement of parties filed, it is ordered that the above-named cause be referred to Hon. John Lowell, as master, to hear the parties and report the facts, with such part of the testimony as either party shall request, and his rulings on any question of law arising in the case."

The report was filed August 11, 1891. On November 29, 1897, the exceptions were filed; the time for filing having been extended by agreement of parties. The master made certain findings of fact and rulings of law.

Where parties consent to the reference of a case to a master to hear and decide the issues and report his findings, both of fact and of law, such findings are to be taken as presumptively correct, and will not be disturbed unless for manifest error in the consideration given to the evidence, or in the application of the law. Kimberly v. Arms, 129 U. S. 512, 524, 9 Sup. Ct. 355, 32 L. Ed. 764; Davis v. Schwartz, 155 U. S. 631, 636, 637, 15 Sup. Ct. 237, 39 L. Ed. 289; Crawford v. Neal, 144 U. S. 585, 596, 12 Sup. Ct. 759, 36 L. Ed. 552; Furrer v. Ferris, 145 U. S. 132, 134, 12 Sup. Ct. 812, 36 L. Ed. 649; Schwartz v. Duss (C. C. A.) 103 Fed. 561, 565.

The plaintiffs have confined their oral and printed arguments mainly to the discussion of the fundamental question on which the case turns. This question is raised by several exceptions, which differ in form of statement. As bearing on the main question, the exception to the ruling of the master admitting evidence of the previous negotiations between the parties to the contract has also been discussed. I shall limit the consideration of the exceptions to these two questions.

Article 1 of the contract declares:

The defendant "shall pay to the" plaintiffs "upon all telephones used in the United States, under any license from the" defendant, "express or implied, unless expressly excepted, a royalty or bonus of twenty per cent. of all rentals or royalties actually received or rated as paid in accordance with the provisions of this contract, from licenses or leases for speaking telephones, exclusive of call bells, batteries, wires, and other appliances, or services furnished or performed."

The controversy turns upon the interpretation of the words "rentals or royalties" in this provision. The defendant contended before the master that these words had reference to the standard annual rentals for telephones, and did not include profits derived from the exchange business. In support of this contention the defendant relied—First, upon the contract; and, second, upon evidence of the previous course of business, the negotiations and correspondence between the parties, and prior drafts of the contract. The master, against the objection of the plaintiffs, admitted this evidence, not to vary the terms of the contract, but to explain the sense in which the language was used. If the contract had been limited to the above provision in article 1, with the words "or rated as paid in accordance with the provisions of this contract" omitted, it might have been argued with much force that the meaning of "rentals or

royalties" is plain and admits of but one interpretation, and that it covers everything in the nature of rental or royalty which was received from any license for telephones by the Bell Company. But, reading the whole of this provision in connection with the provisions which follow, the most that the plaintiffs can fairly claim is that the case presents a contract which is capable of two interpretations. This being true, it was clearly proper for the master to admit evidence of previous negotiations and surrounding facts and circumstances relating to the subject-matter of the contract, in order to reach an interpretation of the language used in accordance with the understanding of the parties at the time the contract was entered into. That such evidence is admissible where a contract is capable of two interpretations and a doubt exists as to the true meaning is well established. Nash v. Towne, 5 Wall. 689, 699, 18 L. Ed. 527; Canal Co. v. Hill, 15 Wall. 94, 100, 21 L. Ed. 64; Moran v. Prather, 23 Wall. 492, 501, 23 L. Ed. 121; Reed v. Insurance Co., 95 U. S. 23. 30, 24 L. Ed. 348; Brawley v. U. S., 96 U. S. 168, 173, 24 L. Ed. 622; Merriam v. U. S., 107 U. S. 437, 441, 2 Sup. Ct. 536, 27 L. Ed. 530; Railway Co. v. Jurey, 111 U. S. 584, 592, 4 Sup. Ct. 566, 28 L. Ed. 527; Knox Co. v. Ninth Nat. Bank, 147 U. S. 91, 99, 13 Sup. Ct. 267, 37 L. Ed. 93; Sargent v. Adams, 3 Gray, 72; Stoops v. Smith, 100 Mass. 63, 66; Fuller v. Miller, 105 Mass. 103; Keller v. Webb, 125 Mass. 88, 89; Bassett v. Rogers, 162 Mass. 47, 51, 37 N. E. 772; Machine Co. v. Graffam, 156 Mass. 415, 31 N. E. 485.

Upon the fundamental question in the case,—whether "rentals or royalties," in article 1, include exchange profits, or refer only to standard annual rentals for telephones,—the master ruled substantially as follows: The "rentals and royalties" which are to be divided between the parties are certain annual sums, which are definitely fixed in the contract, with a certain latitude for increase or diminution. The word "royalty," in this contract, is used interchangeably with "rental," and cannot be construed to mean anything other than rental. The exclusive right to do an exchange business was left with the defendant, and this cannot be construed as anything less than the right to the profits of the business, whether carried on alone or jointly with others. The previous Ormes contract made by the parties to this suit was the basis of the present contract. The Ormes contract contemplates that the defendant, in any one of several contingencies, will carry on exchanges, or authorize them to be carried on, and that it will then pay one dollar (with a minimum of $^{75}/_{100}$) for each telephone to the plaintiffs, and nothing more. The meaning of the contract of November 10, 1879, appears to be the same. The defendant might have obtained larger rentals for its telephones used in some, or perhaps in all, of the exchanges in question, if it had chosen to charge them. They would, however, have varied with each exchange according to the size of the city, and other circumstances which would affect the probability of profit to the exchange company. The contract contemplates a regular standard rental, as the rental or royalty in which the plaintiffs are to share, substantially alike for each class of business, and not to vary with the value of the use in particular cases. By the

contract the defendant clearly had the exclusive right to carry on the exchange business alone or jointly with others, and to receive its profits, paying to the plaintiffs 20 per cent. of the stated rentals. The defendant considered that it was selling its exclusive right to carry on the business, and that, in whatever way the value of this right was realized, it was the exclusive owner of it. To the rulings of the master the twenty-eighth exception fairly presents the vital question in the case:

"Because the master rules and finds that by the contract of November 10, 1879, the defendant 'clearly had the exclusive right to carry on the exchange business alone or jointly with others, and to receive its profits, paying to the plaintiffs twenty per cent. of the stated rentals,' and that when it did not carry on such business alone, but licensed another corporation to carry it on, receiving for such license a share of the profits, without putting into the business anything but the license to use the telephones, such shares of the profits are not to be considered as rentals or royalties from licenses or leases for telephones, twenty per cent. of which is by the terms of the contract to be paid to the plaintiffs, whereas the master should have found and ruled that such share of the profits is 'rental or royalty' for the use of telephones, within the meaning of the contract, and that the plaintiffs are entitled by the terms of the contract to twenty per cent. thereof."

To this exception may be added the twentieth:

"Because the master found that the 'rentals and royalties,' twenty per cent. of which the contract of November 10, 1879, required to be paid by the defendant to the plaintiffs, 'are certain annual sums, which are definitely fixed in the contract, with a certain latitude for increase or diminution,' and that the word 'royalty,' as used in the contract, 'is used interchangeably with 'rental,' and cannot be construed to mean anything other than 'rental,' whereas the master should have found that the word 'royalty,' as used in said contract, means whatever compensation or return the defendant company might receive for the use of the telephone patents, whether in the specific form of rental or in any other form."

Previous to November, 1879, the plaintiffs and defendant were rivals and competitors in the business of telephonic communication in this country. Together they controlled the entire business. Each party claimed the right of exclusive control under its own patents, and as a result they were engaged in a long and expensive litigation. The Western Union Company also controlled, to a large extent, the business of telegraphic communication in the United States, and it was important to protect that interest. During the progress of the litigation the counsel for the Western Union Company advised his client that Bell was the first inventor of the telephone. This led to negotiations between the parties which terminated in the contract of November 10, 1879. The negotiations extended over a period of months, and were conducted by principals and counsel of acknowledged skill and experience, who recognized the importance and magnitude of the interests involved. The contract was the outcome of numerous drafts, with amendments, alterations, and concessions on both sides. It covers 28 printed pages of the record. It is elaborate in its provisions, minute in detail, and drawn with the greatest care and deliberation. It defines the contract meaning of "telephone," "rentals or royalties," "standard rates" of rentals under licenses in the United States, and "profit" on telephones sold for export. It deals with what constituted the telephone business in

all its complex ramifications, as then carried on by the plaintiffs and defendant. It transfers, for a consideration, that business to the defendant, and secures to the plaintiffs the telegraph business. By making an absolute and complete transfer of the entire business to the defendant, and providing a simple method of accounting, in the form of a "royalty or bonus" to be paid on each telephone instrument licensed at home or sold abroad, the parties found a satisfactory solution of the most important question in the complex and difficult problem of the adjustment of their affairs. There has been no change in the telephone business or in the manner of conducting it since the date of the contract, except in two particulars: (1) A large increase in the exchange business, and consequently in the profits derived therefrom; and (2) in the general adoption by the defendant of the plan of granting permanent or perpetual exclusive licenses in place of exclusive licenses for a limited time,—generally five years,—with the privilege of taking the plant at cost at the end of that time, as a mode of realizing profits from the exchange business.

The first Bell patent was granted in 1876, and the defendant began business the following year. It first leased telephone instruments directly to customers at annual rentals, but soon adopted the plan of allotting specified territory to individuals or companies who were to furnish customers with telephones supplied by the defendant at a fixed "annual rental." These "agents" were paid by a commission on the rentals. They were to construct and furnish lines, retaining such profits as they might realize. As the business developed it was found that the exchange system afforded an important and profitable use for telephones. Recognizing this, the defendant began to make licenses for a limited term (generally five years) to local companies, who were to build exchanges and to retain all the profits of the exchange business, reserving, however, to itself the right to take the plant at a fair valuation, not exceeding actual cost, at the end of the term. Previous to November 10, 1879, the defendant made 185 territorial contracts. Some were for private lines, but the larger number were for exchanges. By these contracts the defendant gave a license to use telephones for district or exchange purposes in a certain territory at the regular rental fixed from time to time, less certain commissions, and further agreed not to license any other persons to use telephones for such purposes in such territory. The licensee agreed to pay the rentals to build and equip telephone lines, and to establish exchanges and district systems sufficient for the wants of the community within said territory. Upon the termination of the agreement the defendant might take possession of the property and purchase the same at a fair valuation, to be determined by arbitration or otherwise, not exceeding actual cost. Included in the 185 contracts there were three special contracts,—the New York contract, the Philadelphia contract, and the Ormes contract. By the first two, which are similar in terms, the defendant agreed to transfer the exclusive right to use and rent telephones at the annual rental of $10, less commissions, and the licensees agreed to pay the rentals, and in addition a certain por-

tion of their capital stock. These contracts are significant, as showing that in two important instances the defendant had adopted the practice, where permanent licenses were given, of receiving shares of stock from its licensees in addition to annual rentals. There is evidence that the plaintiffs had knowledge of these contracts. It was never suggested that this stock was "rental," or in lieu of "rental." The third special contract deserves notice, as it was the basis of the contract in suit. This was a tripartite agreement between the plaintiffs, the defendant, and one Ormes, by which the plaintiffs withdrew from the telephone business in a large territory, and received $1 on each telephone instrument used in exchanges or 'on connecting lines, and, subject to this payment, all the profits of the business belonged to the defendant or its licensee, Ormes. The defendant granted to Ormes an exclusive license to carry on the exchange business in seven states. It was to receive the regular rentals for telephones, less certain commissions. The licensee was to establish exchanges, and the defendant was to grant to each exchange the exclusive right to the business of its district. The defendant reserved the right to establish an exchange in any place where none had been established within 15 months, and to connect exchanges. At the end of 10 years, if no agreement for a continuance of the contract was made, the defendant would pay the value of the exchanges as determined, without consideration for telephone franchises. The plaintiffs were to receive from Ormes "a bonus of one dollar per annum" (with a minimum of 75 cents) "on each telephone rented or used by him." This bonus was also to be paid by the defendant on telephones in any exchange or on any connecting line established by it. After the license terminated, if the business was carried on by the defendant, the bonus of $1 was to continue to be paid to the plaintiffs by the defendant. It is very significant that the contract in suit follows the general lines of the Ormes contract. At the date of the contract in suit the defendant owned exchanges established in Boston, Lowell, Worcester, and Chicago. When the defendant owned the exchange, it charged itself the annual rentals, precisely as it did to strangers. Before November 10, 1879, the defendant carried on the exchange business in three ways: By itself, as in Boston and Chicago; by short-time licenses, under which it received a regular rental of $10, less commissions, on each telephone instrument, with the right to buy the plant at cost at the expiration of the license; by perpetual licenses in two cases, under which the defendant received the regular annual rental of $10 on each telephone instrument, and a share in the licensees' capital stock.

The course of business of the plaintiffs, and the contracts they made, show the same recognized distinction between "rental of telephones" and profits of the exchange business. Three of the plaintiffs, by a contract entered into December 22, 1877, were associated together in the telephone business. The American Speaking Telephone Company owned what were known as the "Western Union Patents," and received schedule annual rentals for telephones put out. The Gold & Stock Telegraph Company leased the instruments,

built the lines, and established exchanges. The Western Union Company also established exchanges. On March 13, 1879, the committee on "telephone rentals" of the American Speaking Telephone Company voted to approve "a new list of rentals." Then follows a schedule beginning as follows:

Jan. 1, 1879.
Rental Per Annum, Including Commission.

Single Duplex Telephone............................... $10 00
In combination with another telephone or for interior use    5 00

The course of business is stated in the deposition by Mr. Taylor, auditor of the Gold & Stock Telegraph Company:

"Int. 34. I understand when the Gold & Stock or the Western Union furnished telephones, under those and similar contracts, to any of the customers where they built lines,—the American Speaking received a certain sum per year on each telephone, according to the schedules already put in,—and that the rest of the money paid by the purchaser went to the Gold & Stock or the Western Union, respectively; they paying the expenses of the lines, maintenance, and so forth. Was that the regular course of business? Ans. That is substantially correct."

On July 17, 1879, the executive committee of the Gold & Stock Telegraph Company voted as follows:

"That this company waive any right it may have as against the Western Union Company to the exclusive control and profits of the business of telephone exchanges as a species of private lines under the contract between the Western Union Telegraph Company and this company, * * * and, in consideration of the profits accruing to this company for the rental of telephones for the greater part of such exchanges, do hereby consent and approve their establishment, purchase, ownership, and operation by the Western Union Telegraph Company."

It thus appears that the distinction between "rental of telephones" and "profits of the business of telephone exchanges" was as well known and established in the telephone business as carried on by the plaintiffs as by the defendant. It was a universal distinction, which entered into every contract, and it will be seen that the accounting under the contract in suit is founded upon this same distinction.

The previous negotiations between the parties also throw light upon this general scheme of the contract. They were begun by the advice of Mr. Gifford, counsel for the plaintiffs during the progress of a suit brought by the defendant against Dowd, which was defended by the Western Union Company. Mr. Gifford states in his testimony:

"A very vigorous defense was made by the Western Union Company, and testimony of great length and at great expense was taken in support of the answer. After the testimony was closed, or substantially closed, on both sides, I was convinced that Bell was the first inventor of the telephone, and that the defendant Dowd had infringed said Bell's patent by the use of telephones in which carbon transmitters and microphones were elements, and that none of the defenses which had been set up could prevail against him; and I advised the Western Union Company to that effect, and that the best policy for them was to make some settlement with the complainants."

The negotiations which followed Mr. Gifford's advice show—First, that the plan looking to the formation of a company in which there

should be a division of stock, and as a consequence a division of all profits, exchange or otherwise, failed, after months of effort; and, second, that the "new basis" of a royalty or bonus of 20 per cent. of the annual rentals of all telephones, which was finally adopted, was furnished by the Ormes contract of August 26, 1879, which was made while the negotiations were pending, and after the plan of a division of stock in a new company had proved unsuccessful. Mr. Forbes, the president of the defendant company, states in his testimony:

"During the entire spring of 1879 negotiations were in progress for a settlement of the contest between the Western Union Telegraph Company and its associates and the National Bell Telephone Company, and those negotiations for a number of months (during the entire spring of that year. I should say) looked to the formation of a company in which a division of stock should be made, part to each contestant. Those negotiations continued until the midsummer of 1879, when it was found that no agreement could be reached upon any such basis as that."

Mr. Forbes further testifies:

"At the time the negotiations failed to make a settlement on the plan of a division of stock, the question of the patents was referred to counsel, Mr. Gifford and Mr. Chauncey Smith, to see if they could reach any conclusion as to their merits, which we could use as a basis for settlement; and while they were engaged upon that work in the summer of 1879 (I should say in August, 1879) a man named Ormes, who held a license from the Bell Telephone Company to operate their patents in the seven seaboard states (the seven Southern states along the seaboard), made an arrangement, subject to our approval, with the Western Union, to pay them one dollar a year upon each telephone that he used in that territory; they agreeing to withdraw wholly from that field. * * * About the time that the Ormes negotiation had been concluded, Mr. Chauncey Smith and I met Dr. Green and Mr. Gifford, the counsel for the Western Union Telegraph Company, at Dr. Green's office in New York, and there was a general discussion of the situation between the parties, in the course of which this settlement (which was, by the way, for ten years) with Ormes for the seven seaboard states was mentioned; and the suggestion was made whether that would not be a good basis for a settlement for the rest of the country, to which Mr. Gifford immediately expressed his opinion that it would, and it led to a discussion as to the possibility of coming to an agreement upon substantially similar terms for the entire country. That is the 'new basis' that Dr. Green refers to. He was not prepared to act upon that at that time. He had to bring the suggestion to the attention of his associates, and I came back to Boston. That was the basis which was referred to in his correspondence, and which led to the renewal of negotiations, and finally to the conclusion of the November 10th contract."

On September 1, 1879, Dr. Green, president of the Western Union Company, wrote to Mr. Forbes:

"I sent telegrams, and had everyone on the lookout for Dr. White, whom I learned was somewhere in the White Mountains with his family, but did not hear from him till Friday morning, when he turned up at Newport. He stopped for a few minutes on Saturday, and when I presented the new basis to his consideration he appeared unfavorably impressed with it, and thought it too much a surrender. I told him I did not so consider it, and he finally promised to think it over and return here Tuesday morning. If this basis be entertained, there are incidental questions that will need to be disposed of, as part of it."

On September 3d Dr. Green again wrote to Mr. Forbes:

"After an all-day's conference with our telephonic committee yesterday, * * * we reached the conclusion that, if the other matters referred to can

be satisfactorily adjusted, we would assent to a settlement on the basis of a royalty or bonus for our patent rights and good will in the business,—the royalty to be twenty per cent. of the annual rentals of all telephones, less commissions paid for placing them, which bonus shall not be less than one dollar per telephone per annum, except for telephones used in houses, and for reduced rates under pressure of competition, as provided in the Ormes contract, in which cases we shall receive a royalty or bonus of not less than seventy-five cents each per annum."

On September 13th Dr. Green wrote to Mr. Forbes with respect to a draft agreement:

"Your first stipulation is: 'The party of the second part is to pay to the party of the first part twenty per cent. of all annual rentals received from telephones, and also of all proceeds of sales of telephones, commissions on rentals. or proceeds paid to agents being first deducted.' * * * With all this, I have been unable to see how we can be secured in the percentage of revenue from the business that we bargained for without stipulating for a minimum on each instrument, or a minimum rental below which they shall not be placed without our consent. I agree that it will be more your interest to maintain larger returns for the instruments used than ours. And it was that that made me hastily and inconsiderately yield the point at one time; but there are so many ways in which you may get large returns otherwise than by rentals—that our several executive committees, all of which have had sessions since, strenuously object to putting the whole matter out of our hands, with no security as to what may accrue to us under the operation of the contract. And, the more I have studied the subject, the more I am satisfied that we must insist upon it. If experience in the business should demonstrate that a larger revenue could be derived from rentals at three dollars per annum than at six dollars per annum, we should be more ready to consent to it than your party, because on your side it would bring no corresponding reduction in the manufacturing account. I can see no reason, therefore, why you should not assent to a minimum price at which telephones should be rented. unless the price be reduced by the consent of both parties. * * * The stipulation to pay twenty per cent. of the legal expenses in defending the patent rights is substantially as agreed."

The basis of settlement which was satisfactory to Dr. Green and those he represented, as appears by his letter of September 3d, is the same as we find in the contract subsequently made. That basis, as stated by him, was a "royalty or bonus"; "the royalty to be twenty per cent. of the annual rentals of all telephones, less commissions paid for placing them." The reference in this letter to the Ormes contract shows its close connection with the contract in suit. This whole correspondence makes the meaning of the contract clear and unmistakable, if any doubt can possibly arise after carefully reading its provisions. It is also significant that in several of the earlier drafts of the contract there are words or expressions which might afford some basis for the plaintiffs' claim. But all expressions of this character were stricken out, and do not appear in the contract as finally agreed upon. The main provisions of the contract are as follows:

By article 1:

(1) The defendant "shall pay to the" plaintiffs "upon all telephones used in the United States, under any license from the" defendant, "express or implied, unless expressly excepted, a royalty or bonus of twenty per cent. of all rentals or royalties actually received or rated as paid in accordance with the provisions of this contract, from licenses or leases for speaking telephones (exclusive of call bells, batteries, wires, and other appliances, or services furnished or performed). The rentals or royalties upon which said royalty or bonus to

be paid to the" plaintiffs "is to be reckoned shall, for that purpose, be ascertained by deducting from the gross rental or royalty received or rated as hereinafter declared, the commissions and allowances herein provided for. (2) The royalty or bonus to be paid on telephones made in the United States solely for export, and not licensed for use in the United States, shall be twenty per cent. of the net profit actually derived by the" defendant "in their manufacture and sale above the cost of such manufacture, not including any part of the general expense of the" defendant "as part of such cost, and not including in the manufacturer's profit any enhancement of price fairly due to the fact that the" defendant "holds or in any way controls a monopoly of the use of such telephones in any foreign country other than Canada, if such case shall exist: provided, however, that, where the" defendant "shall be in any way interested in the purchase or use of such telephones in such foreign country, it shall be at the option of the" plaintiffs "to require an accounting for all telephones so exported as if sold at a fixed profit of thirty-three and one third per cent. upon the cost of manufacture. (3) Allowance shall be made for rentals or royalties which cannot be collected, and for usual and reasonable deadhead or free privileges."

Article 2 declares:

"Concerning the sum which is to be taken as the gross rental or royalty for the purpose of the preceding article, it is declared and agreed: (1) The word 'telephone,' as used in this contract, refers to an instrument for electrically transmitting or receiving articulate speech, and is understood*to mean either a transmitting instrument incapable of use as a receiver, a receiving instrument incapable of use as a transmitter, or an instrument capable of being used both as a transmitter and receiver. (2) Ten dollars per annum for each telephone where only one is used at a terminal or station, and fifteen dollars per annum for a pair of telephones composed of an instrument used for sending and another instrument used for receiving, used at one terminal or station, are recognized as the present standard rates of gross rentals or royalties; and the" defendant "may change them, subject to the qualifications of sections 4 and 5 of this article, but not otherwise. (3) Telephones used on exchanges or lines owned in whole or part by the" defendant, "or by auxiliary corporations or organizations in which it is interested, or rented together with lines owned in whole or in part by it, or by auxiliary corporations or organizations in which it is interested, shall be rated as paying to said" defendant "the said recognized standard rates, or such other rates as may hereafter be established in accordance with this contract for like uses by parties other than the" defendant, "or auxiliary corporations or organizations in which it is interested, less the commissions and allowances provided for by this contract; but, whenever the" defendant "is or shall be interested with others in the ownership of such exchanges or lines, the annual rental or royalty actually charged to and received from the owners thereof for the use of the telephones, if greater than the rates established as aforesaid, shall be taken to be the gross rental for the purpose of ascertaining the stipulated bonus or royalty. (4) No reduction from the said present recognized standard rates which shall be made on telephones used on exchanges or lines owned in whole or in part by the" defendant, "or by auxiliary corporations or organizations in which it is interested, or rented together with lines owned in whole or in part by it, or by auxiliary corporations or organizations in which it is interested, shall operate to reduce said royalty or bonus to be paid to the" plaintiffs "below $1.00 per annum for each terminal single telephone, and $1.80 per annum for each terminal pair, unless such reduction be made with the consent of the" plaintiffs, "or as provided in the following section."

By article 3 the following commissions and allowances are to be made from the gross rentals:

"On telephones used in district or exchange systems owned in whole or in part by the" defendant, "or by auxiliary corporations or organizations in which it is interested, an allowance or commission of thirty per cent. On telephones taken by the" plaintiffs "for private lines," "or used by the" defendant "on its own lines, or put out by it, by its own officers or servants, for

any use other than on district or exchange systems in which it is interested as aforesaid, twenty-five per cent."

On all other telephones the rate actually paid, not exceeding 40 per cent.

By article 4:

The plaintiffs "shall bear and pay twenty per cent., and the" defendant "eighty per cent., of all reasonable legal expenses incurred in ascertaining, investigating, and determining, and in prosecuting and defending rights which the" defendant "may have, claim, or wish to acquire pertaining to telephones, or the right to use telephones, or to inventions used in telephones, and concerning patent rights which it or others may claim respecting the same, including expenses in suits and in proceedings in the patent office relating to such rights, or to the collection of rentals or royalties on telephones."

By article 5:

The plaintiffs grant to the defendant, "as far as they, or either of them, have the legal power so to do, an exclusive license during the full terms for which patents thereon have been or may be granted, to make, to use, and to license others to make and to use in speaking telephones, call bells, and switches, and other appliances for use on telephonic lines, any inventions or improvements therein which it, or those whom it represents, as aforesaid, now own or control, in whole or in part, by contract or otherwise, under which it or they have the authority to grant such license, and whether already patented or not, and which the" defendant "shall not otherwise have the right to use; reserving, however, to the" plaintiffs, and those they represent, "the right to use said inventions in switches, call bells, and appliances other than telephones in connection with the telephones which they are or may become entitled to use under this contract. Instruments or apparatus made under this license shall be deemed to be licensed only for the uses above named, and not for any other purpose." The plaintiffs further agree "to acquire any further inventions adapted to be used in connection with telephones which it may have the right to so acquire under existing contracts with George M. Phelps and Thomas A. Edison, and to license the" defendant "under the same for use in telephones or on telephone lines; the" defendant "agreeing to pay to said" plaintiffs "in reimbursements whatever the said" plaintiffs, or those they represent, "may be required to pay therefor." "If" the plaintiffs "shall hereafter acquire ownership or control as aforesaid of other inventions adapted to be used in connection with telephones, the" defendant "shall have the right or license to use the same for telephonic purposes, and shall be bound to pay to the" plaintiffs "the cost thereof, or a due and proportionate part of said cost. Such right or license shall be exclusive for telephonic purposes during the whole period of this contract, and shall continue, but shall not be exclusive after its expiration."

By article 6 the plaintiffs "agree to withdraw from the manufacture, rental, and use of telephones" except as excepted in the contract.

By article 12 "the right to all uses of the telephone on wires of a district or exchange system is to remain exclusively with" the defendant, with a temporary exception not now important.

By article 13 "the right to connect telephonic district or exchange systems for the purpose of personal conversation between persons at the instruments, and the right to use telephones on all lines not forming a part of a telephonic district or exchange system for such personal conversation (except so far as licenses for private lines are to be granted to the" plaintiffs "under article 14), are to remain exclusively with the" defendant "and those licensed by it for the purpose. But such connecting and other lines are not to be used for the transmission of general business messages, market quotations,

or news for sale or publication in competition with the business of the Western Union Telegraph Company, or with that of the Gold and Stock Telegraph Company," etc.

By article 14 the defendant agrees to license the plaintiffs to use telephones for transmitting telegraph messages, and for use on private lines, which were defined to be lines each consisting of a single circuit on which the telephones were to be used for the individual and private business of the lessees, and not for other business nor for a consideration or toll. The defendant was to turn over to the Western Union Company, as far as possible, all messages which were to be transmitted by telegraph, for a commission of 15 per cent. The parties agreed that the contract should be a settlement of all suits.

By article 18 the defendant agreed to keep accounts of "the number of telephones manufactured, licensed, and put out for use in the United States, and also of the rentals received and commissions or allowances paid or allowed as" in the contract "provided, and of the number manufactured and sold in foreign countries, and the amount received therefor," and to render accounts and pay balances quarterly. The contract ran for a period of 17 years from its date.

The true interpretation of this contract becomes more clear and certain the more we study the subject-matter with which it deals, and the course of business in relation thereto. The telephone business is founded on a patented instrument known as the "speaking telephone." A telephone, unlike most patented things, is capable of several uses. It may be used on private lines to connect two houses or two offices, or it may be used in an exchange system, or to connect several exchange systems. "A telephone exchange is an arrangement for putting up and maintaining wires, poles, and switch boards within a given area, with a central office, and the necessary operators to enable the individual hirers of telephones within that area to converse with each other." In the case of a private line, the customer is furnished with (1) a telephone instrument and (2) auxiliary apparatus and services in the form of call bells, batteries, and care of instruments and apparatus. In the case of an exchange system, the customer is also furnished with the exchange service and its accompanying features, which include connection with the exchange and all subscribers, telephone operators, etc. It is necessary to keep in mind that "telephone," according to the course of business, and in this contract, refers only to the instrument itself, apart from wires, batteries, call bells, switch boards, and other apparatus and appliances with which it is connected in its practical and commercial use. Again, we must not forget that it is a marked and universal peculiarity in the telephone business, as conducted in the United States, that the instruments are always rented, and never sold. Another special feature is that the telephone is capable of several different uses. It is the uses made of the telephone which comprise a large part of the telephone business, and constitute its commercial value. It may be said that the telephone business proper begins with a rented instrument; an instrument which is subject to an annual rental; a standard annual rental. No matter which one of the several commercial uses it is put to, the annual rental is an

inseparable accompaniment.   Every telephone instrument put out in the United States has, figuratively speaking, written across its face, "This telephone is not sold, but is leased at the standard annual rental."   It follows from this method of doing business that the rentals derived from telephones have always been known and recognized as something entirely separate and distinct from the profits derived from the telephone business.   The amount which the customer pays was always divided into two parts,—rental of telephone and the income or profits of the business, largely the exchange business.   Rental of telephones was a certain, definite, and fixed quantity, subject only to variation in the commission allowed; while the profits of the business, though they might be many times greater, were variable, uncertain, and, in a measure, speculative, because dependent on the kind of use, locality, business management, and other conditions.   The owner of the telephone patent sometimes carried on the exchange business, but more often granted this privilege to others in license contracts to use and rent telephones.   But, in whatever way the exchange business was conducted, the annual rental always followed each telephone instrument as a permanent and inseparable fixture.

A reading of the contract clearly shows that the accounting contemplated by this defendant to these plaintiffs for telephones leased in the United States is strictly confined to rental of telephones, and does not extend to profits derived from the employment of the telephone in various ways.   It is an accounting for the rental of a thing, a chattel, a telephone instrument stripped of all the apparatus and appliances which are necessary to its successful and profitable use. It is also immaterial what patents are embodied in its physical structure, whether the plaintiffs', the defendant's, or both, or neither, provided it is a speaking telephone.   It is a share of the annual rental of this thing, and nothing more, for which the defendant must account.   The contract provides for a complete transfer (with unimportant or temporary exceptions) by the plaintiffs to the defendant of their entire interest in the telephone business, and their abandonment of the business in all its branches.   The plaintiffs "agree to withdraw from the manufacture, rental, and use of telephones."   They grant to the defendant an exclusive license of their telephone patents, and agree to give it the benefit of any further inventions used in connection with telephones which they may acquire.   The telephones put out by the plaintiffs and all telephone exchanges become the property of the defendant.   The contract contemplates that the defendant shall lease all telephones put out for use in the United States, and sell all telephones which are exported.   It expressly provides that the use of telephones in district or exchange systems, or to connect district or exchange systems, shall "remain exclusively" with the defendant.   From the scheme of the contract it is manifest that it creates no partnership or joint estate between the parties. Such a plan had been suggested and abandoned.   Nor does it create a trust estate to be managed by the defendant.   The entire telephone monopoly and business become the absolute property of the defendant.   The plaintiffs are entitled to no accounting concerning

the profits of the business. They are simply entitled to an account of the number of telephone instruments leased in the United States or sold for export; and they are to be paid, in quarterly payments, 20 per cent. of the annual rentals on telephones leased at home and 20 per cent. of the manufacturer's profits on telephones sold abroad. The monopoly profits on telephones sold for export are expressly excepted in the contract.

As the plaintiffs rely upon the "fundamental covenant" contained in the first section of article 1, and especially on the words "rentals or royalties," it is important to point out what this provision means in the contract. It provides that the defendant shall pay "a royalty or bonus of twenty per cent. of all rentals or royalties actually received or rated as paid in accordance with the provisions of this contract from licenses or leases for speaking telephones (exclusive of call bells, batteries, wires, and other appliances, or services furnished or performed)." It then declares that the "rentals or royalties" shall be ascertained by deducting from the gross rental or royalty received or rated "the commissions and allowances herein provided for." To ascertain the meaning of this provision in this contract, and the accounting called for under it, it is only necessary to point out: First, the contract meaning of "telephone"; second, the contract meaning of "rentals or royalties actually received or rated as paid" "from licenses or leases for speaking telephones"; third, the contract meaning of "commissions or allowances." If the contract makes the meaning of these words or phrases clear and unmistakable, no doubt can arise as to its true interpretation.

First. Article 1 excludes from the contract meaning of telephones "call bells, batteries, wires, and other appliances, and services furnished or performed." The thing which each license transfers for the use of the licensee is the instrument used by a party in speaking or listening, and not the combination of apparatus and appliances by which persons remote from each other talk together. This is made certain by section 1 of article 2, which declares that "the word 'telephone,' as used in this contract, refers to an instrument for electrically transmitting or receiving articulate speech, and is understood to mean either a transmitting instrument incapable of use as a receiver, a receiving instrument incapable of use as a transmitter, or an instrument capable of being used both as a transmitter and receiver." ·

Second. Article 2 defines the meaning of "rentals or royalties actually received or rated as paid." It begins: "Concerning the sum which is to be taken as the gross rental or royalty for the purposes of the preceding article." After giving the definition of "telephone" it proceeds: "(2) Ten dollars per annum for each telephone where only one is used at a terminal or station, and fifteen dollars per annum for a pair of telephones composed of an instrument used for sending and another instrument used for receiving, used at one terminal or station, are recognized as the present standard rates of gross rentals or royalties." The contract meaning of "rentals or royalties" is thus defined as the standard annual rentals which had always been known in the telephone business. Section 3 of

the same article then explains what is meant by rentals or royalties "rated as paid." The defendant might directly own telephone lines or exchanges, or, through auxiliary corporations or otherwise, might be indirectly interested therein, and in such cases might not license or lease the telephones employed on such lines or exchanges, or might not actually receive any rentals or royalties therefrom. It was therefore stipulated that such telephones should be "rated" as paying at the regular standard rates. This was also in accordance with the established course of business. The important question in the case is the meaning of "rentals or royalties" in article 1, and, without specially referring to all the provisions of the contract which help to show what sums these words were intended to cover, I shall here adopt, substantially, the analysis of the defendant's counsel as an accurate statement: "Rentals or royalties" in this contract are sums accruing "from licenses or leases for speaking telephones," according to an existing course of business recognized and referred to in the contract; sums which, according to such course of business and by the explicit provisions of section 2, are to accrue annually; sums for which there are "present standard rates"; sums fixed in accordance with such "present standard rates" at $10 per annum for a single telephone, and $15 for a pair; sums which might be larger at the defendant's pleasure, but smaller only with the plaintiffs' consent or after arbitration; sums to be "rated" as paid, when, by reason of the defendant's interest in a license or lease, they are not actually received; sums which may be lower than the standard rates in the cases of certain exceptional classes of telephones particularly described; sums reducible at the defendant's pleasure after the expiration of certain patents, unless the defendant's monopoly of speaking telephones is preserved through other patents; sums of which (with any commissions and allowances paid or allowed) the defendant is to keep and render proper accounts.

Third. By article 3, "commissions and allowances" on telephones are declared to be 30 per cent. in some cases, 25 per cent. in other cases, or amounts actually paid, not to exceed 40 per cent. Near the end of the contract we find article 18, which makes certain the scope and nature of the accounting. It declares that the defendant shall keep in regular books "accounts of the number of telephones manufactured, licensed, and put out for use in the United States, and also of the rentals received and commissions or allowances paid or allowed as herein provided, and of the number manufactured and sold in foreign countries, and the amount received therefor." The accounts shall be open for inspection quarterly, and all accounts shall be settled quarterly.

Taking the contract as a whole, and without the aid of extrinsic evidence, the intention of the parties, the basis and plan of the agreement, and the nature of the accounting seem clear, unmistakable, and certain. As the telephone business was then conducted, it is doubtful if any substantial controversy could have arisen as to the meaning of the written instrument. And the real question in this case, as it seems to me, is whether the court will now adopt a construction of the contract at variance with its plain meaning,

because the defendant has since changed its course of business in one important respect, and has undertaken to realize its share of exchange profits through the form of a perpetual exclusive license. Should not the court look to the substance rather than the form? Should it seek to give effect to the form unless it comes within the provisions of the contract? If the meaning of "rentals or royalties" is fixed in the contract, the meaning remains unchanged, and the new method adopted in its license contracts becomes merely the form in which the defendant undertook to do a certain thing. That it might have done the same thing in another way cannot be disputed. And it may be observed in this connection that the amount of profits, whether great or small, coming to the defendant by reason of making this change in the form of its licenses, is of no consequence. Such profits are outside of any obligation or accounting imposed upon the defendant by the contract.

The plaintiffs' main argument is based upon the hypothesis that we are to interpret the first section of article 1 as if it stood alone, and ignore the following provisions of the contract, as well as the recognized course of business, although in this section we find the significant words "rated as paid," which immediately direct attention to the primary principle on which the accounting rests. Upon this assumption the argument is forcible. There are also some branches of their argument which cannot be controverted, but which are inapplicable to the contract in suit. It is true that the only consideration given for this stock was perpetual exclusive licenses for certain localities, and that, leaving out the other provisions of the contract, this stock might fairly be considered as "rentals or royalties actually received" "for speaking telephones." But that is not this case. In the case presented we must be governed by the contract definition of "rentals or royalties" which follows article 1, made doubly clear by the previous course of business as carried on by both the plaintiffs and defendant. The plaintiffs were not to receive 20 per cent. of "rentals or royalties" from licenses, considered as a general proposition apart from the other provisions of the contract, but they were to receive 20 per cent. of the "rentals or royalties" contemplated by the contract, and understood by the parties at the time it was made. It is also said that "rentals or royalties" include the entire profits of the combined patents; but this is a direct contradiction of the whole scheme of the contract and of its provisions. The plaintiffs were not to share in the general profits of the defendant's monopoly or business. Whether those profits were due to the combined patents or not has nothing to do with the accounting called for by the contract. The plaintiffs were entitled to 20 per cent. of "all rentals or royalties" defined by the contract as the standard annual rentals of certain instruments called "speaking telephones." As to what patents are embodied in these instruments, to what particular use these instruments are put, or what profits the defendant may receive from such use, the plaintiffs have no concern. The provisions in the contract respecting the use of the telephone in exchanges or otherwise are simply the means and regulations employed to subject every telephone instrument

leased by the defendant to the payment of a standard annual rental.

It is true that the license contracts of the defendant made prior to the contract in suit were exclusive contracts to rent and use telephones for particular localities, and that the license contracts made subsequent to the contract in suit, and for which stock was received in addition to annual rentals, were exclusive licenses to rent and use telephones, and that the only difference between the two classes of contracts is that the former were for short terms, with the privilege of taking the plant at cost upon their termination, and the latter were permanent or perpetual licenses. But this circumstance does not solve the question at issue in the plaintiffs' favor, because its solution does not depend upon the form of the license, but upon the meaning of "rentals or royalties" in the contract in suit. Further, we are to inquire, in this connection, the purpose of the defendant in changing the form of its license. By this change the defendant considered it was selling its exclusive right to carry on the exchange business, which was its own property under the contract. Instead of carrying on this business itself and taking all the profits, which it had the right to do under the contract, it adopted the method of selling this privilege for a consideration, in the form of stock in the licensee's company, by the grant of a perpetual exclusive license.

Admitting that the right of the defendant to authorize others to do an exclusive exchange business came from the combined patents secured by the contract of November 10, 1879, still that contract confers no right upon the plaintiffs to a share in the profits of the combined patents further than 20 per cent. of the standard rentals of telephone instruments. The contract says nothing about the combined patents, or the results of the combined patents, or rights growing out of the use of the combined patents, or the profits of the combined patents. It deals with the standard rental of a thing termed a "speaking telephone," and it leaves the rest of the telephone business to the defendant. Again, it is not denied that the defendant, by selling the perpetual exclusive right to an exchange business, might have increased the "rentals or royalties" instead of taking stock in the licensed companies, but it was under no obligation so to do, because the exchange business was its own property, and was known and recognized as something distinct from rentals of telephones. If the exchange business belonged to the defendant, and it had the right to carry it on and receive its profits, only accounting to the plaintiffs for a share of the standard rentals of the telephones used therein, it cannot be said that because the defendant sells this right to others, by making licenses permanent as well as exclusive, it thereby converts the profits received into "rentals or royalties," within the meaning of the contract. Such a construction cannot be adopted without doing violence to the plain intention of the parties as expressed in the contract.

Importance is attached to the circumstance that "royalties" is added to the word "rentals" in the contract. But this has no material significance—First, because the meaning of "rentals or royalties" is defined in the contract; second, because, in dealing with patent rights, "royalty" is perhaps a more common and better term

than "rental"; third, because the two words are apparently used interchangeably in the contract; fourth, because to interpret "royalty" as meaning something more than "rental," and to include exchange profits, would be to overturn the basis upon which these parties were finally enabled to reach an agreement after months of negotiations. Attention is also called to the fact that the plaintiffs are to pay one-fifth of certain expenses. An inspection of this provision shows that such contribution is limited to patent rights, and does not extend to the general business. As the plaintiffs receive a one-fifth share of the rental of a patented instrument, the proposition seems readily to have been agreed to by them to pay their proportional part of the expenses incident to investigating, prosecuting, and defending "rights" pertaining to telephones.

There are some general considerations which the plaintiffs urge should have some weight in the determination of the question presented. Reference is made to the large profits coming to the defendant from the adoption after the contract of a comparatively new method respecting its leases, and the relatively small amount received by the plaintiffs. It is also said that, in justice and equity, the defendant should have increased the standard rentals by the amount of this stock, because of the contribution made by the plaintiffs to the combined patents,—the source of all profits. But these and other like considerations cannot lead the court to place an interpretation upon a contract which is repugnant to its clear and plain provisions.

With respect to the general question of the inadequacy of the consideration received by the plaintiffs under the contract as now interpreted, it is well to bear in mind that the original Bell patent was the primary patent which lies at the foundation of the telephone business, and that before the contract was made the counsel for the plaintiffs had advised his clients that "Bell was the first inventor of the telephone." Exceptions overruled, and the master's report confirmed.