LUHRIG COAL CO. v. JONES & ADAMS CO.

(Circuit Court of Appeals, Sixth Circuit. December 20, 1905.)

No. 1,423.

1. CONTRACTS—LEGALITY OF PROVISIONS—HOW DETERMINED.

The legality of a provision of a contract is to be determined by its terms and character, and not by what the parties did or attempted to do thereunder, and evidence of an attempt to take action thereunder which was fraudulent or illegal is not necessary to support a finding of the illegality of the agreement.

2. SALES—CONTRACT—CONSTRUCTION—SALE OF COAL FOR FUTURE DELIVERY.

A coal company owning mines contracted to sell to a customer a large quantity of coal, a specified quantity to be delivered on cars at the mines each month in substantially equal daily amounts. The contract provided that the company should use every effort to secure sufficient cars for the shipment of all the coal required by the contract, and that, "if it fails to secure sufficient cars to do so, it agrees to load and deliver to the party of the first part a part of the cars it may receive in the proportion that the coal called for under this contract each day bears to the total pro-

duction of coal from mines of the party of the second part for such day." It was known by both parties that the company had no storage, but that coal was loaded from the mines into cars, and that the production was therefore limited by the supply of cars, and there was evidence that it was also understood that the company would have other contracts to fill. *Held*, that such provision should be construed in the light of such known facts and of the whole contract, and that it required the company, in case there were insufficient cars to enable it to fill all of its contracts, to give the purchaser its proportionate share of the coal produced and shipped, without discrimination in favor of any other customer.

**3. SAME—DELIVERY TO CARRIER.**

Cars of coal which were loaded by the company at the mines and billed to the purchaser in its shipping orders to the railroad company in compliance with the contract, but which the railroad company refused to ship and appropriated to its own use under plea of necessity, are to be considered, as between the parties to the contract, as having been delivered to the purchaser in fulfillment of the contract.

In Error to the Circuit Court of the United States for the Southern District of Ohio.

The Jones & Adams Company, defendant in error, a dealer in coal at Chicago, brought this suit against the Luhrig Coal Company, the plaintiff in error, a proprietor of coal mines at Luhrig, Ohio, to recover damages for the breach by the latter of the contract following:

"This agreement made this 31st day of May, A. D. 1902, by and between the Jones & Adams Company, a corporation of the state of Illinois, party of the first part, and the Luhrig Coal Company, a corporation of the state of Ohio, party of the second part, witnesseth, that:

"(1) The party of the second part agrees to sell and furnish to the party of the first part, seventy-five thousand (75,000) tons of lump coal from its mines and on cars at its mines at Luhrig, O., during the period from June 1st, 1902, to March 31, A. D. 1903, and the party of the first part agrees to buy and receive such coal.

"(2) Shipments of said coal shall be made at times and quantities as follows:

"2,500 tons during the month of June, 1902.

"2,500 tons during the month of July, 1902.

"5,000 tons during the month of August, 1902.

"7,000 tons during the month of September, 1902.

"10,000 tons during the month of October, 1902.

"11,000 tons during the month of November, 1902.

"11,000 tons during the month of December, 1902.

"11,000 tons during the month of January, 1903.

"8,500 tons during the month of February, 1903.

"6,500 tons during the month of March, 1903.

"Said deliveries for each month shall be made in substantially equal daily amounts.

"(3) The party of the first part agrees to pay on the 15th of each month for all coal shipped under this contract during the calendar month preceding at the following prices:

"For coal shipped in June, July and August, $1.15.

"For coal shipped in September, October and November, $1.25.

"For coal shipped in December, January, February and March, $1.35.

"All per net ton of 2,000 lbs., f. o. b. cars at the mine.

"(4) It is mutually agreed that the screen used in preparation of this coal shall be of regular dimensions stipulated in the Miners and Operators' Agreement of Ohio, screen to be of not less than 1¼ inch diamond bar, and should the party of the second part desire to use a larger screen at any time it shall have the privilege of so doing.

"(5) The quality, preparation and appearance of the coal furnished here-

under by the party of the second part shall be equal in every way to standard Hocking Lump Coal furnished for the Chicago market by the Sunday Creek Coal Company, and the party of the first part shall have the right to rescind and annul the unexecuted portion of this contract if the quality and preparation of the coal is at any time not such that it can be sold in the Chicago market as Standard Hocking Coal.

"(6) The party of the second part shall use every reasonable effort to secure sufficient cars for the shipment to the party of the first part of all the coal called for by this contract, and if it fails to secure sufficient cars to do so, it agrees to load and deliver to the party of the first part a part of the cars it may receive in the proportion that the coal called for under this contract each day bears to the total production of coal from mines of the party of the second part for such day.

"(7) It is understood by both parties that this contract is subject to strikes, contingencies of transportation and other causes beyond the control of either party.

"(8) During the continuance of this contract, the party of the second part shall sell coal from mines for the Chicago market and for the northwestern territory supplied with said coal through Chicago and Peoria, only to the party of the first part, intending hereby to give the party of the first part exclusive right to sell in said Chicago and northwestern market, coal mined from mines of the party of the second part.

"(9) It is further agreed that if the party of the first part fails during any month to take the coal called for in this contract during such month, the party of the second part shall be excused from furnishing such deficit of coal thereafter, unless it desires to do so.

"Witness the signatures of the parties hereto this 31st day of May, A. D. 1902.        The Jones & Adams Company,
                      "By H. C. Adams, Its Vice President.
              "The Luhrig Coal Company,
                      "By A. Cunninghame, Its President."

The breach of the contract alleged consisted in the failure of the coal company to furnish the coal contracted for in this agreement; the plaintiff averring that only 14,126 tons thereof was in fact furnished by the defendant during the whole period prescribed for delivery. The plaintiff further alleged that the market value of such coal increased during that period to such an extent that the damages suffered by the plaintiff were as much as $120,144.15. By leave of the court an amended petition was subsequently filed, wherein the plaintiff, instead of setting forth the contract in hæc verba, alleged the substance of it as interpreted by the pleader. The answer of defendant admitted its failure to deliver all the coal contracted for, but denied that the failure ensued from any fault on its part, and proceeded to state several defenses, which for the present purpose may be summarized under two heads: First, that by reason of strikes among its miners, and by reason of smallpox at its mines, its inability to obtain cars, the refusal and delays of railroad lines in handling the coal, and other contingencies of transportation, accidents at its mines, and other causes beyond its control, it was prevented from delivering to the plaintiff more coal than it did deliver; second, that the said contract was illegal and void, in that by one of the stipulations thereof (the fifth clause being the one referred to) the plaintiff contracted for the means whereby it would be able to sell in the Chicago market the Luhrig Company's product as and for "Standard Hocking Coal" from the mines of the Sunday Creek Coal Company, whereas, in fact, it was not such, but of a lower grade, and thereby deceive the public, who would be induced to purchase the coal upon the faith that it was standard Hocking coal from the mines of the Sunday Creek Coal Company. Upon the trial evidence was given directed to both of these defenses. The jury rendered a verdict for the plaintiff in the sum of $63,108.

Upon this writ of error the defendant below complains of certain rulings of the court on the trial relating to the construction of the contract and the defenses above specified.

Edward Colston and S. M. Johnson, for plaintiff in error.

C. B. Matthews and Wm. Burry, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

SEVERENS, Circuit Judge, having made the foregoing statement, delivered the opinion of the court.

It seems preferable to consider first the rulings of the trial court upon the question of the legality of the stipulation contained in clause 5 of the contract, concerning the manner in which the coal should be prepared for delivery. Generally a question of this sort is one appearing upon the face of the contract, and is one for the court. But sometimes it may be necessary, in order to determine the meaning of the parties, to resort to facts in pais, to be ascertained from evidence of extraneous circumstances. The court below evidently regarded this case as belonging to the latter class, and the trial proceeded upon that understanding. It became the duty of the court to instruct the jury in respect to the law applicable to the case upon the facts as the jury should find them, and it became the duty of the jury to determine the facts and apply the law as it should be given them by the court. The court, in giving instructions upon this point which seem otherwise unobjectionable, gave the jury to understand that it was necessary to make out this defense, that it should be made to appear that the plaintiff had attempted to carry out the objectionable purpose by actually attempting to sell the Luhrig Company coal as standard Hocking coal, such as that furnished by the Sunday Creek Coal Company. The court said to the jury:

"Before you can find that this contract was one against the public policy, or one intended to deceive the public of Chicago in buying coal, the defendant must show, by a preponderance of the testimony, that that was the purpose of the plaintiff and the object of making the contract; and there should be some evidence to show that there was an attempt to put it upon the market as Sunday Creek coal; in other words, there should be some evidence before you to show that they did intend to deceive the public."

This was misleading. The legality of the contract was to be judged of by its character, and not by what the plaintiff might do, or should attempt to do, with the fruits of it. Church v. Proctor, 33 U. S. App. 1, 66 Fed. 240, 13 C. C. A. 426; McMullen v. Hoffman, 174 U. S. 639, 648, 19 Sup. Ct. 839, 43 L. Ed. 1117 (where Mr. Justice Peckham said: "The vice is inherent in contracts of this kind, and its existence does not in the least depend upon the success which attends the execution of any particular agreement") ; Weber v. Shay, 56 Ohio St. 116, 46 N. E. 377, 37 L. R. A. 230, 60 Am. St. Rep. 743; Materne v. Horwitz, 101 N. Y. 469, 5 N. E. 331; Harriman on Cont. (2d Ed.) 271.

Elsewhere in its charge the court instructed the jury correctly by stating that the purpose of the plaintiff in requiring this stipulation must have been to enable it to deceive the public. But the error was not thereby cured. The jury might well have inferred that, in order to prove the unlawful purpose, it was necessary to prove that the plaintiff attempted to carry it out. Durant Mining Co. v. Percy Consol.

Mining Co., 93 Fed. 166, 35 C. C. A. 252; Standard Life & Accident Ins. Co. v. Sale, 121 Fed. 664, 57 C. C. A. 418, 61 L. R. A. 337; 11 Encycl. of Pl. & Pr. 148, where a great number of cases to the same effect are cited.

The other question involves the construction of the sixth clause of the contract. It will be convenient to repeat it in this connection.

"(6) The party of the second part shall use every reasonable effort to secure sufficient cars for the shipment to the party of the first part of all the coal called for by this contract, and if it fails to secure sufficient cars to do so, it agrees to load and deliver to the party of the first part a part of the cars it may receive in the proportion that the coal called for under this contract each day bears to the total production of coal from the mines of the party of the second part for such day."

It is urged by defendant in error that no question arose under this clause because there was at all times a sufficiency of cars. But it quite clearly appears that this assumption of fact is not well founded. It is seen that it was anticipated that there might be occasions when there would be a shortage of cars, and there was evidence tending to show that on many days, notwithstanding the efforts of the Luhrig Coal Company to procure them, there was a shortage of cars available for shipping coal. There was evidence also tending to show that the Luhrig Coal Company had no storage ground, and that their coal was directly loaded upon the cars as it was brought out of the mine, and therefore that the production of the mine was restricted to the capacity of the cars available for receiving it, and that these conditions and methods of mining and shipping at the Luhrig Company's mines were known and understood by the officers of the Jones & Adams Company when the contract was made. There was evidence from which it might be inferred that the coal company would have other contracts for the sale and delivery of coal to other parties, and that the Jones & Adams Company knew this and expected that such would be the fact. In the light of these facts, what is the proper construction to be put upon clause 6, which was to govern the execution of the contract upon days when there should be a shortage of cars? It must be confessed the language is obscure. Counsel have differed in its construction, and the court below did not agree to the contention of either. It cannot be taken literally to any sensible result. Resort must therefore be had to settle rules of construction. The leading one is that, when the court can discern the main purpose of the parties, it will construe the words and clauses of the instrument in a way to effectuate the main purpose if that can be done without doing violence to the language employed, and considerable latitude is justifiable if the main purpose is clear. Upon the authority of a great number of cases, English and American, state and federal, it is stated in 17 Am. & E. Encl. of L. 4, 5, that:

"One of the rules of interpretation most frequently referred to is to the effect that the intention must be determined by a consideration of the whole instrument rather than of any particular clause; the theory being that the parties presumably had the same general purpose and object in view in all parts of the instrument, and consequently, if some of the stipulations are more

obscure than others, or one part is seemingly inconsistent with another, the main purpose and object, as collected from the whole instrument, may be so clear and distinct as to throw light upon such obscure or inconsistent parts."

In Tennessee v. Whitworth, 117 U. S. 129, 137, 6 Sup. Ct. 645, 648, 29 L. Ed. 830, Chief Justice Waite said:

"In construing statutes which are binding on states as contracts, the words employed are, if possible, to be given the same meaning they had in the minds of the parties to the contract when the statute was enacted. In this respect there is no difference between a contract of a state and a contract of a natural person. If the words employed are capable of more than one meaning, that meaning is to be given them which, taking the whole statute together, it is apparent the parties intended they should have."

And see Chesapeake, etc., Canal Co. v. Hill, 15 Wall. 54, 21 L. Ed. 64; and O'Brien v. Miller, 168 U. S. 287, 296, 297, 18 Sup. Ct. 140, 144, 42 L. Ed. 469, where Mr. Justice White brought very distinctly into view the grounds which support his statement that:

"The elementary canon of interpretation is not that particular words may be isolatedly considered, but that the whole contract must be brought into view and interpreted with reference to the nature of the obligations between the parties, and the intention which they have manifested in forming them. Boardman v. Reed, 6 Pet. 328, 8 L. Ed. 415; Canal Co. v. Hill, 15 Wall. 94, 21 L. Ed. 64."

This canon has a very direct application to the expressions "and if it fails to secure sufficient cars so to do," and "total production of coal," in the sixth clause of this contract.

It seems to us that here the dominating idea was that, in the event of an insufficient number of cars to supply the coal company's demands on any day when coal should be shipped, the Jones & Adams Company should be accorded their proportionate share of the cars which could be secured, and that there should be no discrimination in favor of other parties. Upon this construction the proper formula in case of the shortage would consist in the following proportion; that is to say, the part of the cars due plaintiff each day is to the whole number of cars available for shipping coal that day, as the number of car loads due the plaintiff by the terms of the contract that day is to the number of car loads due all parties for that day. The contract says that party shall have "a part of the cars," evidently recognizing that the other cars are to be given to others; and what others could be intended than the customers of the coal company? We are confirmed in this interpretation of the contract by the letters of the Jones & Adams Company to the coal company written during the period fixed for the delivery of the coal. On October 4, 1902, the Jones & Adams company wrote a letter to the coal company, in which, after calling attention to the contract and complaining that the coal company was "shipping large amounts to other places and practically none to us," they say:

"We understand you receive all the cars you need. Even if that was not so, we desire to call your attention particularly to clause 6 of the contract, which requires you to ship us a proportion of your output."

And in the letter of President Jones to the coal company on January 19, 1903, after referring to a letter from the coal company, he says:

"You seem to insist in your letters that the railroad company must be taken care of before our contract with you is considered. We do not care anything about where you put your coal, our contract is based upon the supply of cars for loading coal to everybody, including the railroad, and we must insist upon it being carried out on these lines when the proper time comes.

"Yours very truly,                              J. S. Jones, President."

These letters plainly show that the Jones & Adams Company understood that the coal company would be delivering to other parties, and that the former expected to share with such parties in the deliveries. The practical construction which parties put upon their contract during its operation, where its meaning is doubtful, is of much weight in settling its construction. And this shows what was meant by the preceding clause, where it is said "and if it [the coal company] fails to secure sufficient cars to do so" that is, to furnish all the coal called for by the contract—then, etc., and indicates not that the sufficiency of cars intended was merely a sufficiency of cars to supply the Jones & Adams Company the coal due to that company, but to supply them and others with whom they expected to share. So, also, it fixes the meaning of the words "the total production of coal," in the latter part of the clause, to be the total expected production; that is to say, what would be necessary to meet all the engagements of the coal company. The criticism made by counsel for the defendant in error is that under this construction the Jones & Adams Company would be at the mercy of the coal company, for the latter might contract for the delivery of coal beyond the capacity of the mines. A sufficient answer to this objection would be that such overcontracting would be in violation of the spirit of the contract and the coal company would not be allowed to take advantage of any excess arising from overcontracting for deliveries of coal.

Again, the regular and established method of conducting a business is of significance in construing a contract relating to it. In the case of Western Hardware Mfg. Co. v. Bancroft-Charnley Steel Co., 116 Fed. 176, 53 C. C. A. 548, it was held by the Circuit Court of Appeals for the Seventh Circuit that, when a contract relating to the furnishing of certain articles of machinery was obscure, the kind of business in which the seller was engaged was important in determining whether the contract was one of bargain and sale, or for the manufacture and sale, of such articles. In Lillard v. Kentucky Distilleries, etc., Co., 134 Fed. 168, 67 C. C. A. 74, we held that a contract for a sale and delivery of refuse of a distillery to a feeding lot raised a strong presumption that there was some usage with reference to which the parties made their contract, and that, when proved, such usage became a part of it. And in McKeefrey v. Connellsville Coke Co., 17 U. S. App. 35, 56 Fed. 212, 5 C. C. A. 482, it was held by the Circuit Court of Appeals for the Third Circuit that a contract for coke, deliverable daily, which stated that the seller should not be held responsible for the railroad company's failure to supply transportation, but was silent as to the consequences if the cars furnished were insufficient to supply all the seller's customers, should be construed by reference to a usage among dealers (which was proven in that case) to apportion the in-.

sufficient supply of cars among all the customers of the seller equally in proportion to their contracts. As we have said, in that case such a usage was proved. But here that which was there a usage is recognized in the contract as the basis of the stipulation. As the court there said, "in contemplation of law, the usage is written into the contract." Here it is actually written in.

But there is another factor to be reckoned with. It appears that during a part of the time prescribed for making deliveries the only railroad company running to the mines refused to bill out to Jones & Adams cars of coal which were loaded and billed to them in the shipping orders of the coal company, and altered the bills so as to make the railroad company consignee at such places on the railroad company's lines as it might require coal for its own use. Finally the railroad company refused altogether to furnish cars for transporting coal to any other party than itself. The excuse assigned for this action of the railroad company was that on account of a strike or strikes of miners in the great coal mines in the East the railroad company was compelled to lay hold of any coal within reach, in order to keep its lines in operation. It is contended for plaintiff in error that coal once loaded and billed to Jones & Adams Company should be regarded as delivered to them. We think this is correct, and it seems to have been the understanding of the Jones & Adams Company, for in President Jones' letter to the coal company of December 24, 1902, he says:

"In several of your letters you speak of your coal being confiscated by the railroad. We know nothing about your arrangements with the railroad company. The contract only requires that you load the coal on cars at your mines for us. If you do that, the coal is ours. If it is confiscated, we will deal with the railroads in regard thereto."

Again on February 26, 1903, in another letter to the coal company, President Jones says:

"We are surprised at your letter and cannot agree with you that you were to ship the coal anywhere. Our contract calls for delivery to us on cars at your mines, and that we will attend to the shipping."

The court below was requested to charge the jury that such would be the effect of loading and billing the cars to the Jones & Adams Company. But the court refused to give this instruction, and error is assigned thereon. We think the instruction should have been given. Such car loads of coal as were not billed, but which the railroad company seized in excess of its rights by contract with the coal company, should not be included in determining the number available to the coal company for the daily shipments to the Jones & Adams Company and its other customers. The court below appears to have taken a different view in respect to the proper construction of clause 6. The coal company called Mr. Cunninghame, the president of the company, and put to him this question:

"During this period from June 1st to April 1st what was the amount of your contracts that you had to fulfill, of all the contracts, including the railroad, and including Jones & Adams?"

This was objected to by counsel for the plaintiff upon the ground thus stated:

"The proportion we were to get was from the proportion of the output, not from a proportion of the contracts."

The court sustained the objection and excluded the evidence, observing that in its judgment the "total production of coal" in the last part of clause 6 meant the actual production, and the effect of the ruling was that the volume of the coal company's contracts was not a factor in determining the proportion of cars to which the plaintiff was entitled in case of shortage. We are not quite clear what the court meant by "actual production," but we will consider this question further when reviewing the court's instructions to the jury. In explaining this sixth clause of the contract to the jury, the court said:

"Now, I do not know whether the jury have fully understood just what that provision means, and, lest you might not fully understand it, for the purposes of illustration and for purposes of illustration alone, I will suggest or call attention to the method of arriving at what was meant by this clause: In October, for instance, under the contract, 10,000 tons of coal were to be delivered. Now, if we assume that the working days in that month were 25, that the daily output of the mine for each working day was 1,200 tons, and that the cars that had been secured and were ready to receive coal, would average 24 for each working day, then we would reach this result: The 10,000 tons divided by 25 will give 400 tons, which the plaintiff would be entitled to receive each working day during that month. The daily output being 1,200 tons, the 400 tons which the plaintiff would be entitled to receive would be one-third of that amount. Now, assuming that there were 24 cars on hand for each working day, the plaintiff's proportion, being one-third, would be 8 cars, and the plaintiff would be entitled to have 8 cars loaded with coal each working day of that month."

By the "daily output of the mine" the court evidently meant the same thing as the "actual production" the court had in mind in excluding the testimony above mentioned which may have been the coal produced that day, the normal daily production, or the daily production of which the mines were capable. And, again, it is seen that the court entirely ignores the extent of the claims of other customers upon the mine. The actual daily output of the mine was often much less than enough to satisfy all the customers, and the effect of this illustration would be to give Jones & Adams Company an undue proportion on such occasions. Thus in the case supposed they would get 8 of the 24 cars, because that is the proportion of the 400 tons due them to the 1,200 tons, and the other customers would get exactly 16 cars, no matter how large their contracts were. If the total amount due to all parties were just 1,200 tons, the result would happen to be the same as in the illustration of the court. But suppose the amount due all parties was 1,600 tons, and the amount due Jones & Adams Company was 400, their share of the cars would be one-quarter of the 24—6 cars. If the amount due all was 2,000 tons, their share of the cars would be one-fifth of the number available. If it be once admitted, as we think it must be, that the contract contemplated that there would be other purchasers of coal who would share with these purchasers in case of shortage of cars, it is difficult to believe it to have been intended that the ratio of sharing as between

141 F.—40

the several purchasers should change from day to day. The fair inference is that the customers were expected to stand upon a footing of equality at all times when there should be a shortage of cars. It follows from what we have said relative to the meaning of this contract that this instruction was erroneous, as was also the exclusion of the testimony of the witness Cunninghame relating to the same subject.

There are some subordinate questions presented by the record, but it is believed the most important are covered by the conclusions already stated, and the others may not arise on the new trial in the same form. The judgment must be reversed and a new trial awarded.