## ACME MFG. CO. v. ARMINIUS CHEMICAL CO.

(Circuit Court of Appeals, Fourth Circuit. July 12, 1919. On Rehearing, February 17, 1920.)

### No. 1707.

1. Sales ⬥➞409—Buyer held entitled to sue for anticipatory breach.

Where, during performance by defendant of a contract to deliver to plaintiff a stated quantity of sulphur pyrites in monthly shipments, it expressly repudiated the contract on the ground that it had expired and refused to make further shipments, plaintiff had the right at its option to treat the contract as ended and to maintain an action for its breach.

2. Sales ⬥➞418(2)—Measure of damages for breach by seller stated.

In an action for breach of a contract by defendant to deliver to plaintiff a quantity of sulphur pyrites, which defendant repudiated without justification after partial performance, where plaintiff used diligence, but was unable to buy elsewhere under market price, its measure of dam-

⬥➞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ages was the difference between the contract price and the market price at the time and place of delivery.

**3. Sales ☞85(2)—Strike provision does not excuse delivery within reasonable time after strike ended.**

Under a contract for sale and delivery of a quantity of sulphur pyrites within a stated time, subject to delays caused by strikes or other causes beyond seller's control, delays from such causes do not relieve the seller from the obligation to deliver within a reasonable time after their removal.

**4. Sales ☞418(1)—No distribution between contracts pro rata, where right not availed of in good faith.**

A defendant, which without justification repudiated a contract to deliver sulphur pyrites to plaintiff, *held* not entitled to a reduction of its obligation to plaintiff's pro rata share of the production of its mine, where it did not make equitable apportionment between its other contracts, but in fact made new contracts at higher prices, and delivered on those most profitable, to the partial and total exclusion of others.

Woods, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of Virginia, at Richmond; Edmund Waddill, Jr., Judge.

Action by the Acme Manufacturing Company against the Arminius Chemical Company. From a judgment for a less amount than demanded, plaintiff brings error. Reversed and remanded, with instructions.

By contract dated October 21, 1915, the defendant sold plaintiff 4,000 to 7,000 tons fines sulphur pyrites, to be shipped at the rate of approximately 500 tons per month, beginning at plaintiff's option on or before January 1, 1916, at a price of 9½ cents per unit of sulphur, delivered f. o. b. cars at defendant's mines. The contract contained a clause providing that it was "made subject to delays and stoppages caused by strikes, accidents, delays by railways, and causes beyond the selling company's control," and also provided that the plaintiff's right to demand pyrites expired January 1, 1917.

On January 8, 1916, the plaintiff ordered defendant to ship to it 150 tons of ore per week until further advised, and this the defendant agreed to do. In the latter part of January, 1916, after only a small quantity of ore had been shipped, there was a cave-in at the mines of the defendant, which seriously interfered with the mines, and for a time practially stopped mining operations. Defendant gave plaintiff prompt notice of this condition, and that it would cause a suspension of shipments from five to six months. On July 27, 1916, defendant advised plaintiff that it expected to resume shipments at the rate of one car for every two under contract about the first week in September, and in the course of a few months it would be able to meet all demands. Letter in question is as follows:

"Beginning about the first week in September, we expect to be in a position to resume shipments of fines pyrites at the rate of one car for every two cars under contract for weekly delivery in January last, at the time of the accident at our mines, and gradually to increase our output each month until 'we fill all contracts. We would appreciate a line from you as to your immediate wants, to enable us to make as fair a distribution as possible. In the course of a few months we shall be able to meet all demands, and also to accumulate the usual reserve on our loading platform. We are sending a letter of like tenor to each of our customers and shall be glad to hear from you at an early date."

Upon receipt of this notice, plaintiff advised defendant that arrangements had been made by it to obtain sufficient ore for its purposes until January 1, 1917, and that, if the defendant preferred, it could begin shipping the balance of its contract January 1, 1917, or it would receive the ore any time be-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

fore that date that suited the convenience of the defendant. Letter in question is as follows:

"Answering yours of the 27th, we have secured ore enough to run us until January 1st. Therefore, if you have other customers who have not supplied themselves, it would be satisfactory to us for you to begin shipping the balance of the contract January 1, 1917; or, if you prefer, we can receive it any time before then that suits your convenience."

On August 1st the defendant again wrote plaintiff, thanking it very much for giving defendant a free hand in the matter, and advised it would begin shipping the balance due under the contract January 1, 1917. Letter is as follows:

"We are in receipt of yours of July 29th, and thank you very much for giving us a free hand in the matter of the shipment of the balance due you under our contract of October 21, 1915. For the present we will book your order to begin shipments on January 1, 1917, recognizing, of course, your right to call at any time before then for your share of our product."

Plaintiff had received 609 tons under this contract at that time, leaving a balance under the contract of 6,391 tons. Plaintiff wrote defendant in January, 1917, and, although some shipments were made, a request for increased shipments was made, and emphasized in February, 1917. On March 1, 1917, defendant, wrote plaintiff that "we have quite a stock of ore on our loading platform ready for shipment, but are entirely without cars," and requested plaintiff to aid in securing cars. It further appears that during the month of March plaintiff undertook to aid the defendant in getting the necessary cars from the railroads. A number of letters and telegrams were exchanged, and there was a personal interview between the treasurer of the plaintiff and the treasurer of the defendant, in Richmond, in regard to the car situation, in order to obtain, if possible, cars for the shipment of pyrites. As a result of the efforts of plaintiff 19 cars were placed at the mines of the defendant for shipments to plaintiff on or about the 4th of April, 1917, and it further appears that the railroads agreed that 6 additional cars per day would thereafter be supplied. On April 4, 1917, defendant wrote plaintiff: "As by the terms of our contract with you of October 21, 1915, your right to demand pyrites expired on January 1, 1917, we very reluctantly advise that no further shipments will be made under it."

It appears that the cars caused to be sent to the defendant's mine by plaintiff, which had not been loaded, were then loaded and shipped out to other customers of the defendant. Thus it will be seen that since August, 1916, the defendant specifically agreed to ship during the year 1917 the balance due on this contract. In pursuance of this agreement it further appears that the defendant had repeatedly promised to ship rapidly, if cars could only be obtained.

It further appears that the treasurer of the plaintiff went to New York and had an interview with the treasurer of the defendant in order to ascertain, if possible, the meaning of the letter of April 4th. At this interview defendant failed to give any reason as to its repudiation of the contract, but informed the treasurer of the plaintiff that it meant just what it said, and that no further shipments under the contract would be made. Immediately thereafter, this action was instituted.

It appears that the price of pyrites rapidly increased during the latter part of the year 1916, and it was very scarce in 1917. Such as was available sold on the market for about 25 cents per unit, whereas the price in plaintiff's contract was 9½ cents per unit. It also appears from the evidence that there was delivered under the contract 1,793.34 tons, leaving a balance of 5,260.66 tons. It also appears that plaintiff used every effort, after the contract was repudiated, to purchase elsewhere the pyrites contracted for, but only succeeded in getting a small amount, which cost on the basis of f. o. b. Arminius delivery 25 cents per unit. It was shown by a number of witnesses that 25 cents per unit on a basis of f. o. b. Arminius delivery was a fair average market price of pyrites during the year 1917, and on a basis of a fair market value of 25 cents per unit, the damage sustained by plaintiff amounted to $33,895.35.

It was also shown by the evidence that the defendant made new contracts for the sale of its pyrites at more than double the price for which it agreed

to sell to the plaintiff, after the repudiation of the contract by defendant, and that it delivered practically the entire output of its mine in 1917 to those who made new contracts with it; to one of its customers it delivered twice the amount called for on its old contract; that to another of its customers, whose contract was for a larger amount, it did not deliver any; and that in the deliveries made to its customers no regard was had to the pro rata amount due each customer.

T. D. Savage, of Norfolk, **Va.**, for plaintiff in error.

C. V. Meredith, of Richmond, Va., and R. L. Gordon, Jr., of Louisa, Va. (Gordon & Gordon, of Louisa, Va., and Meredith & Meredith, of Richmond, Va., on the brief), for defendant in error.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge (after stating the facts as above). It is insisted by plaintiff that an accident, strike, or suspension clause in a contract, under circumstances analogous to the case at bar, does not justify the abrogation of such contract, but does have the effect of suspending performance only, except in cases where such accident or strike renders it impossible of ever being performed. In addition to this, however, it should be borne in mind that the defendant wrote the plaintiff a letter on August 1, 1916, in which it was stated:

"For the present we will book your orders to begin shipment on January 1, 1917, recognizing, of course, your right to call at any time before then for your share of our products."

This and the other letters passing between the parties, as well as the part performance of the contract by defendant, we think clearly establish a contract for shipments during the year 1917. Even if the provisions of the contract had been such that, under the circumstances of this case, it would have expired on January 1, 1917, by limitation, the same was extended by the agreement of defendant, as evidenced by its letter of August 1, 1916.

[1] Therefore we have only to consider the remaining questions, the first of which is as to whether, under the circumstances, the plaintiff's cause of action accrued when defendant declared on the 4th day of April, 1917, that it would not comply with its contract. In this instance the repudiation was complete and unconditional, and the contractual relations were renounced on the ground that the time had expired in which plaintiff could demand further shipments of the product. While it is true that the defendant stated in its letter of that date that it had done everything in its power to supply its customers with ore, and that every ton shipped had been at a great loss to it, in the next sentence it said:

"And as by the terms of our contract with you of October 21, 1915, your right to demand pyrites expired January 1, 1917, we very reluctantly advise you that no further shipments will be made under it."

Thus it will be seen that it based its right to repudiate the contract squarely on the ground that same had terminated on the 1st day of January, 1917. In other words, it denied the right of plaintiff to require performance. Under this contract, which is mutual and therefore binding upon the parties alike, the plaintiff had the right to in-

sist upon the maintenance of the contractual relations between the parties until under the contract the time for performance arrived. The rule is well stated in Corpus Juris, vol. 13, page 653, as follows:

"Where there has been a renunciation of an executory contract by one party, the other party has a right to elect between the following remedies: (1) To rescind the contract and pursue the remedies based on such a rescission. (2) To treat the contract as still binding and wait until the time arrived for its performance, and at such time to bring an action on the contract for breach. (3) To treat the renunciation as an immediate breach and sue at once for any damages which he may have sustained."

Also in the case of Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953, the court, among other things, said:

"The parties to a contract which is wholly executory have a right to the maintenance of the contractual relations up to the time for performance, as well as to a performance of the contract when due. * * * The promisee has the right to insist on the contract as subsisting and effective before the arrival of the time for its performance, and its unimpaired and unimpeached efficacy may be essential to his interests, dealing as he may with rights acquired under it in various ways for his benefit and advantage. And of all such advantage, the repudiation of the contract by the other party, and the announcement that it never will be fulfilled, must, of course, deprive him."

Central Trust Co. v. Chicago Auditorium, 240 U. S. 581, 589, 36 Sup. Ct. 412, 414 (60 L. Ed. 811, L. R. A. 1917B, 580), is very much in point. There the court, in discussing this phase of the question, among other things, said:

"It is no longer open to question in this court that, as a rule, where a party bound by an executory contract repudiates his obligations or disables himself from performing them before the time for performance, the promisee has the option to treat the contract as ended, so far as further performance is concerned, and maintain an action at once for the damages occasioned by such anticipatory breach. * * * There is no doubt that the same rule must be applied where a similar repudiation or disablement occurs during performance."

As we have stated, this contract was renounced and repudiated in no uncertain terms long before the time for its performance expired. The plaintiff accepted the renunciation of the contract, and immediately thereafter instituted this action.

The contract was terminated, owing to the action of the defendant, and no longer existed, except for the purpose of being used as evidence as to the amount of damage that may be due plaintiff on account of the defendant's breach of the contract. Under these circumstances, we are of the opinion that plaintiff undoubtedly had the right to institute this action, and we will now consider the question as to the measure of damages.

[2] In view of the circumstances, plaintiff is entitled to recover the difference between the market price at the time and place of delivery. It appears that plaintiff was diligent in his efforts to purchase the article in question elsewhere, so as to mitigate the damages sustained as much as possible. In the case of Roehm v. Horst, supra, the Supreme Court, in referring to this phase of the question, said:

"On the other hand, the promisee may, if he thinks proper, treat the repudiation of the other party as a wrongful putting an end to the contract, and may at once bring his action as on a breach of it; and in such action he will be

entitled to such damages as would have arisen from the nonperformance of the contract at the appointed time, subject, however, to abatement in respect of any circumstances which may have afforded him the means of mitigating his loss."

In the case of Avery v. Bowden, 5 E. & B. 714, 85 E. C. L. 714, 119 Reprint, 647, Lord Campbell, in delivering the opinion of the court, among other things, said:

"According to our decision in Rochester v. De La Tour, 2 E. & B. 678, to which we adhere, if the defendant within the running days and before the declaration of war, had positively informed the captain of the Lebanon that no cargo had been provided, or would be provided, for him at Odessa, and that there was no use in his remaining there any longer, the captain might have treated this as a breach and renunciation of the contract, and thereupon, sailing away from Odessa, he might have loaded a cargo from a friendly port from another person, whereupon the plaintiff would have had a right to maintain an action on the charter party to recover damages equal to the loss he had sustained from the breach of the contract on the part of the defendant."

There are numerous other cases to the same effect, but, in view of the well-settled rule, we do not deem it necessary to make any further citations of authority as to this point.

[3] It is insisted by counsel for plaintiff that the court below erred in not recognizing the principle that—

"An accident, strike, or suspension clause in a contract has the effect of suspending performance only, and never justifies the abrogation of the contract and the refusal to ever perform it, unless such strike, accident, etc., makes the contract impossible of ever being performed."

This court, in the case of Jackson Phosphate Co. v. Carleigh Phosphate, etc., Works, 213 Fed. 743, 130 C. C. A. 257, in passing upon this point, said:

"In the case of Cottrell v. Smokeless Fuel Co., 148 Fed. 594, 78 C. C. A. 366, 9 L. R. A. (N. S.) 1187, this court held that where one charges himself with an obligation possible to be performed he must make it good, and that unforeseen difficulties, however great, will not excuse him. It was also stated by the court that the rule as announced was subject to the qualification that, where a contract contains a limitation upon an otherwise absolute undertaking, one will be relieved from such obligation 'to the extent that such conditions rendered it unable to perform the contract fully, and to this extent only.'

"The case of Fish v. Hamilton, 112 Fed. 742, 50 C. C. A. 509, was an action for a breach of contract. The contract contained a strike provision, and it is insisted that a strike terminated the life of the contract. In disposing of the matter the court said: 'We concur in the opinion of the court below that the provision affects the terms of delivery only, and that the seller was bound to deliver within a reasonable time after the termination of the strike.'"

In 35 Cyc. 249, the rule is announced as follows:

"'Where the contract provides that delivery shall be subject to strike, the existence of a strike merely suspends deliveries during the strike, and does not terminate the contract, and the seller is therefore bound to resume deliveries after a reasonable time after the strike has ceased.' Indeed, the rule is so well established that we do not deem it necessary to cite further authorities.

"A careful consideration of the authorities relied upon by defendant leads us to the conclusion that they do not apply to the case at bar. As we have stated, under this provision of the contract the defendant could have required the plaintiff to make the balance of the shipments within a reasonable time, and, such being the case, we think that such provision likewise inures to the

benefit of the plaintiff, and that therefore the plaintiff was entitled to deliver the rock within a reasonable length of time after cars were to be had, and that the effort of the defendant to cancel the contract and its refusal to accept further deliveries under the same entitled the plaintiff to recover the amount sued for in this action."

This rule, we think, is well established.

[4] It is also insisted by plaintiff that the court below erred in holding that the defendant could avail itself of the defense of pro rata deliveries, when in fact pro rata deliveries were not made, and the essential facts upon which such doctrine is based did not exist. It appears that, under the instructions given by the court below, it limited the recovery of the plaintiff to pro rata share of the ore mined by the defendant, and permitted the jury, in arriving at its conclusion, to proportion the available amount of ore to the number of contracts and delinquencies of the defendant.

The defendant is entitled to the defense of pro rata deliveries where it finds it impossible, from causes over which it has no control, to fulfill the contract. In such cases defendant is required to do the next best thing, to wit, to apportion the amount available among all its customers, giving to each one his ratable share. This is an exception to the general rule, and is only applied for the relief of an unfortunate defendant who has, by his conduct, shown that he has in good faith made an honest effort to carry out the provisions of his contract. In order to enable a defendant to avail itself of this defense, it must appear that it has treated all customers with absolute fairness, and it must further appear that in the circumstances it had done all that could be expected from one whose purpose is but fair dealing, giving each of its customers the ratable share to which he is entitled under the contract.

Such is not the case in this instance. By making additional contracts for the sale of its product at an increased price, defendant placed itself where it is not entitled to the defense of which it seeks to avail itself. The evidence as to deliveries is very significant, as will appear from the statement as shown by the books. There the amount of shipments as made up shows the amount of the contract on one page and the amount of delivery on another. However, counsel for plaintiff, for convenience in comparison, combines the two in one statement, eliminating the fractions of tons, as follows:

| Name of Customer. | No. of Tons Called for by Contract, Including 1916 Arrears. | No. of Tons Delivered in Year 1917. |
|---|---|---|
| Acme Manufacturing Company | 6,000 tons | 796 tons |
| Barker Chemical Company | 1,896 " | None |
| Caraleigh Phosphate Company | 9,209 " | 3,471 " |
| Grasselli Chemical Company | 1,268 " | 2,688 " |
| Harrison Bros. & Co. | 16,463 " | 110 " |
| Read Phosphate Company | 8,631 " | 1,320 " |
| Richmond Guano Company | 13,414 " | 4,951 " |
| Tennessee Chemical Company | 1,637 " | 483 " |
| West Virginia Pulp & Paper Company | 30,098 " | 29 " |
| Total | 88,616 " | 13,848 " |

From the above statement it clearly appears that in making deliveries the right of each customer to his pro rata share of the available amount for delivery, was not observed. A striking illustration of this may be found in the Grasselli Chemical Company. While it appears that the proportionate amount due this company was about 1,268 tons, there was actually delivered 2,688 tons, more than double the amount this contract called for. It appears that the Barker Chemical Company did not receive a single ton, as compared with the deliveries made to the Grasselli Company. Also the West Virginia Pulp & Paper Company was given 29 tons, whereas under the contract it was due 30,-098 tons. Harrison Bros. & Co. were due under the contract 16,414 tons and only received 110 tons. The plaintiff was due 6,000 tons and only received 796 tons.

It further appears from this statement that, out of the 13,848 tons delivered, 11,110 tons were delivered to Caraleigh Phosphate Company, Grasselli Chemical Company, and the Richmond Guano Company, the three favored customers, and in this connection it is significant that these three customers were the only ones with whom defendant had made new contracts. In view of this evidence, we are of the opinion that the defendant cannot escape liability on the principle of pro rata deliveries as it insists, because there is a total absence of facts upon which to base such contention. In other words, we think the defendant, by its conduct, has forfeited the right to set up the defense of pro rata deliveries. Therefore it becomes immaterial as to whether the plaintiff did or did not get his per cent. of his deliveries.

The case of Garfield, etc., Co. v. Penn., etc., Co., 199 Mass. 22, 42, 84 N. E. 1020, 1024, relied upon by defendant, is easily distinguished from the case at bar. There the contract had not been repudiated, as in this instance. However, in that case the rule which we think should apply in the instant case is well stated in the following language:

"And the auditor * * * ruled also that the conduct of the defendant in delivering coal on its own contracts made after and when in default on the plaintiff's contract deprived it of the defense which otherwise might have been open to it, that it was prevented from making shipments by causes beyond its own control. In spite of the very able argument of the defendant's counsel, we find no error in this."

Also in the case of Metropolitan Coal Co. v. Billings, 202 Mass. 457, 89 N. E. 115, relied upon by defendant, the court, among other things, stated what we conceive to be the true rule in this instance:

"The judge also instructed the jury that as against the defendant the plaintiff would have no right to sell to new customers, and that any inability to fulfill its contract resulting from a desire to sell to others at higher prices or to relieve the necessities of others would not excuse the plaintiff from the obligation imposed on it by the contract. These instructions and the admission of the evidence which was objected to were well warranted."

The doctrine is well stated in the case of Jessup, etc., Co. v. Piper (C. C.) 133 Fed. 108–110. In charging the jury as respects this point Judge McPherson said:

"It is at that point that we approach the question of fact that is to be submitted for your determination, that is, the allegation upon the part of the

defendants that they did not have sufficient cars to enable them to fulfill their contracts, and therefore that they did the next best thing; that is to say, they apportioned their cars among all their customers, giving to each one his due and ratable share. If the facts were as averred by the defendants, I think that would be a fair, a reasonable, and proper thing to do. I do not think the defendants could be called upon to carry out one contract in full at the expense of all the other contracts for which they were equally bound, but that if there was a genuine scarcity of cars, so that it was impossible for them, for example, to carry out more than 25 per cent. of their contracts, if they carried out 25 per cent. of each contract I think that would be perfectly fair and proper and lawful to do, under such a contract as lies before us. * * *

"If it be true that, after it became manifest to the defendants that they could not get cars enough to carry out the contracts which they then had in existence, if they then continued to make additional contracts, thereby certainly decreasing their ability to carry out the contracts they had already made, and if they attempted to supply these subsequent contracts as well as those preceding, then that certainly was not a hindrance beyond their control, but was a hindrance of their own making."

It may be insisted that some of the parties to whom he sold at a higher price were customers with whom he had had contracts for sale at the same prices that he had agreed to sell plaintiff, and that they should be treated in the same manner in prorating as they would have been treated, had they continued under their former contract. If the defendant had, in good faith, continued to perform his part of the contract between such customers and the plaintiff, and had justly prorated between the parties, there would be much force in this contention. But this he did not do. From an examination of the testimony it appears that in some instances, under defendant's system of prorating, some of the customers received more than double the share to which they would be entitled under a fair prorating, as we have stated; and in addition thereto it appears that he sold to outsiders at an advanced rate, more than double the price at which he had agreed to sell to the plaintiff. It would be manifestly unjust to permit the defendant to bring about a situation that would inure to his advantage, that must necessarily result in injury to the plaintiff.

Among other things, the court below refused to give the following instruction offered by the plaintiff:

"The court instructs the jury that the plaintiff had a right to maintenance of contractual relations with the defendant until the time for performance of the contract had expired, and no strike, accident, or railway company's delay which stopped short of making it impossible for the defendant ever to fulfill its contract, would justify the defendant in a flat and positive renunciation of its contract more than six months prior to the expiration of the time for delivery, and if the jury believe from the evidence that the defendant renounced its contract and notified plaintiff that it would not make further deliveries thereunder, in April, 1917, long before the time for deliveries under the said contract had expired, they should find for the plaintiff, even though they may believe that the defendant had cave-ins and other difficulties at its mines, unless such difficulties at the mines of defendant rendered it absolutely impossible for the defendant ever to perform its contract."

We think the court below erred in not submitting this instruction to the jury. From what we have said, it follows that the plaintiff is entitled to recover the damages occasioned by the defendant in re-

fusing to ship the balance of the pyrites, according to his contract, damages to be estimated as we have stated.

For the reasons herein stated, the judgment of the lower court is reversed, and the cause will be remanded, with instructions to set aside the verdict and grant a new trial, in accordance with the views herein expressed.

Reversed.

WOODS, Circuit Judge (dissenting). The question to be decided is the measure of damages for the breach by Arminius Chemical Company of its contract for the sale of pyrites to the plaintiff, Acme Manufacturing Company. Omitting immaterial provisions, the contract was as follows:

"New York, October 21, 1915.

"Arminius Chemical Company, Incorporated, sells to Acme Manufacturing Company, which buys four thousand to seven thousand (4,000 to 7,000) tons (2,240) pounds fines sulphur pyrites averaging 42% and upwards of sulphur from its mines near Mineral, Virginia, to be shipped at the rate of say five hundred (500) tons per month in substantially equal monthly quantities, beginning at buyer's option, on or before January 1, 1916. Prices to be nine and one-half cents per unit of sulphur.

"This contract is made subject to delays and stoppages caused by strikes, accidents, delays by railway companies, and causes beyond the selling company's control.

"The purchaser's right to demand pyrites under this contract will expire January 1, 1917."

There is no dispute as to the essential facts. The defendant made similar contracts to sell pyrites to other customers in 1916; its entire obligations for deliveries in that year amounting to 64,793 tons. In January, 1916, after these contracts were made a cave occurred in the mine which so impeded its operation that defendant could deliver in all only 8,977 tons. On January 25, 1916, defendant by letter notified plaintiff of the disaster and promised to use its utmost efforts to put the mine in workable condition. There was an extended correspondence during the year 1916 with respect to the delay in shipments, defendant's obligations to other purchasers, and the needs of the plaintiff. The importance of the correspondence is that it shows: (1) The recognition by the plaintiff that in view of the condition of the mine it was entitled only to prorate with other customers on equal footing in the total product that defendant could make; (2) the agreement by plaintiff on July 29, 1916, that on account of the disaster the plaintiff might suspend all further shipments for 1916, and begin again on January 1, 1917, thus extending the original contract with its limitations through the year 1917. The total shipments to plaintiff in 1916 were 1,000 tons and 300 pounds. Assuming that plaintiff's contract gave it the option to take 7,000 tons, this was 31 tons more than its pro rata share. Some of the contracts of defendant with its customers, made before the disaster to the mine, were contracts continuing from year to year, so that its obligations to these customers, standing on the same plane as its obligation to the plaintiff, embraced not only the deficiencies for the year 1916, but also the pyrites it had agreed to deliver to these other customers in 1917. The

aggregate of all these obligations for 1917 was 88,616 tons, of which it was able to deliver only 13,850 tons. Its total shipments in 1917 to the plaintiff were 796 tons, 1,360 pounds—140 tons less than plaintiff's pro rata share.

During the year 1917 the difficulties at the mine continued. There was further correspondence between plaintiff and defendant relating to the mine trouble, the delay in shipments and shortage of cars. The culmination came in the following letter from defendant to plaintiff, dated April 4, 1917:

"We regret to announce that, after 15 months' hard work, and the expenditure of a large sum of money, the plan adopted by us for the re-opening of our mine after the cave-in on January 16, 1916, has been condemned by expert mining engineers. We are now about to begin all over again, and it will take from 6 months to a year, if the new plan is a success, to put the mine in operation.

"Since September 10th, when we resumed shipments, we have done everything in our power to supply our customers with ore, notwithstanding the fact that every ton shipped them has been at a great loss to ourselves. We cannot afford to do this any longer, and as, by the terms of our contract with you of October 21, 1915, your right to demand pyrites expired on January 1, 1917, we very reluctantly advise you that no further shipments will be made under it."

Similar letters were sent to defendant's other customers. Defendant made no shipments to plaintiff after the date of this letter. In September, 1917, defendant made new contracts with some of its customers at an increased price—these customers consenting to the increase on the representation of defendant that by reason of the accident to the mine it was impossible for it to furnish pyrites called for at the original price, except at tremendous loss. After making the new contracts, the defendant applied all its product thereon, having renounced all its old contracts.

The plaintiff accepted the renunciation of its contract and brought this action October 31, 1917, for $40,776.12 damages, alleged to be the difference between the market price and the contract price of the difference between 7,000 tons and the amount shipped to plaintiff. The renunciation by defendant, upon its acceptance by plaintiff, became an irrevocable breach by the defendant, conferring upon plaintiff an immediate right of action, the measure of damages being the difference between the contract price of the pyrites, which ought to have been delivered to plaintiff and was not, and the market price at the time of delivery contemplated by the contract. Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953. The issue is: What was the true deficiency in the quantity that ought to have been delivered to plaintiff? The court instructed the jury in effect that, notwithstanding the renunciation of the contract, if the cave in the mine was a cause beyond the defendant's control, preventing the production and shipment in entire fulfillment of all its contracts dated before the disaster for the years 1916–1917, and defendant mined and shipped all the pyrites it could after all reasonable efforts, then, in view of defendant's contracts with other purchasers, the extent of defendant's liability was to ship ratably on all contracts in existence at the time of the accident and standing on the same footing, and that the plaintiff could

only recover damages to the extent of defendant's failure to ship the plaintiff its ratable share of the entire output.

The majority holds that this instruction was erroneous, and that the instruction should have been that by renunciation of the contract the defendant forfeited the right to the pro rata rule, and that the verdict of the jury should be for the difference between the market price and the contract price of the total difference between 7,000 tons and the quantity shipped to plaintiff in 1916–1917. This I agree would be a correct statement of the law, if the renunciation had been of an unconditional contract to deliver to plaintiff 7,000 tons during the years 1916 and 1917. But the contract breached and repudiated by defendant was to deliver 7,000 tons *from its mine subject to causes beyond defendant's control*. It may be, if the cave in the mine had occurred after the breach and repudiation of the contract, it would be held no defense, on the ground that the voluntary renunciation of the seller released the purchaser from the risk of future contingencies. Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953.

But the cave occurred before the renunciation, and the right under the contract which the plaintiff had at the time of the renunciation had become limited to prorate with other purchasers on the same footing in the total output of the mine. This being plaintiff's entire right, it could not be damaged by the breach beyond the value of that right, and the extent to which it was deprived of that right by the defendant is the measure of its damage. It could never have any right to the ratable share of other purchasers, who had made contracts before the accident, unless those purchasers had in due time unconditionally released the defendant from obligation to ship to them, and there is no evidence of such releases.

It is true that, after the repudiation by the defendant and the acceptance of it by the plaintiff, the contract was at an end, and thereafter was available to either party only to ascertain the measure of damages; but in using it for that purpose the purchaser could not strike out its conditions. It was bound to take the whole contract, including exemption of defendant from liability for failure to deliver for "causes beyond the selling company's control."

Application of the measure of liability fixed by the majority opinion illustrates its disastrous hardship. The contracts for 1916 and 1917 amounted to 153,409 tons. Owing to the mine accident defendant was able to produce only 22,829 tons, leaving a deficiency of 130,580 tons. The difference between the contract price and the market price was about $6.50 a ton. As all other purchasers holding contracts at the time of the accident had the same rights as the plaintiff, the result would be a liability of the defendant to its customers of nearly $850,-000, although its contracts were limited to deliveries from its own mine, subject to cause of nondelivery beyond its control, and the condition of the mine in spite of defendant's utmost efforts made full deliveries impossible.

It is true that, after the repudiation of the contracts, the defendant, in violation of the rights of the plaintiff and other purchasers, made new contracts and delivered under them. But the only result of this

was to charge the defendant, as it was charged by the verdict, with all of these deliveries as deliveries which it should have made pro rata on its existing contracts. It could not justly have the effect of charging it for failure to deliver to plaintiff more than its pro rata of what it could produce from its mines.

It seems to me that to hold defendant bound to ship the entire 7,000 tons, without respect to the failure of the mine or its obligations to other customers, is not only inequitable, but denotes the substitution of an absolute contract to ship 7,000 tons for the conditional one, which was made and recognized throughout the entire correspondence. It is really the inflicting of punitive damages for breach of a contract.

The authorities are unanimous that the only right of a purchaser under the conditions here appearing is to share pro rata with other purchasers whose contracts were on the same footing, and that his measure of damages is the loss resulting from defendant's failure to deliver his pro rata share. McKeefrey v. Connellsville C. & I. Co., 56 Fed. 212, 5 C. C. A. 482; Jessup & Moore Paper Co. v. Piper et al. (C. C.) 133 Fed. 108; Luhrig Coal Co. v. Jones & Adams Co., 141 Fed. 617, 72 C. C. A. 311; Oakman v. Boyce, 100 Mass. 477; Metropolitan Coal Co. v. Billings, 202 Mass. 457, 89 N. E. 115. The rule is restated in Garfield & Proctor Coal Co. v. Pennsylvania Coal & Coke Co., 199 Mass. 22, 84 N. E. 1020, relied on by plaintiff; but there it was held that defendant could not avail itself of the pro rata rule, because it had enough coal to fill plaintiff's contract and all others on an equal footing with it.

The District Judge held, and charged the jury, that under the contract the buyer had the right to fix the quantity at 7,000 tons, subject to the other provisions of the contract. As the defendant did not except to this instruction, it is not discussed in this dissenting opinion, though I do not assent to it.

I think the District Judge correctly instructed the jury as to the measure of damages.

## On Rehearing.

PRITCHARD, Circuit Judge. The above-entitled cause was decided at the July term, 1919, in favor of the plaintiff in error. A petition for rehearing was presented by the defendant in error and granted by this court on November 14, 1919, and the case was argued at this term.

After a careful consideration of the contention of counsel for the defendant in error, as well as the authorities cited, we think that the decision of this court in the first instance was correct.

Therefore we adhere to our former opinion reversing the lower court.

WOODS, Circuit Judge. I dissent, for the reasons stated in the dissenting opinion filed after the former hearing.