# Diamond Alkali Co., Appellant, v. Henderson Coal Co.

*Contracts—Coal—Deliveries—Delays—Prorated deliveries—Evidence—Expert accountant—Statement to show ratable apportionment.*

1. Where a contract for the sale and delivery of slack coal provides that, if deliveries are delayed or curtailed by causes beyond the seller's control, they shall be apportioned among all contracts, the liability of the seller is determined by his ability to deliver, and not by a practice in respect to the production of slack coal prior to the date of the contract.

2. In such case, before a seller can justify failure to deliver, it must appear that the cause beyond its control contemplated by the contract prevented performance either partially or in full; its mere existence does not suffice.

3. Every reasonable effort must be made to overcome it before the cause may be used as an excuse, and then only to the extent to which it makes performance reasonably impossible; the burden is on the seller to establish such factors.

4. When the seller may discontinue performance for cause it becomes his duty to apportion fairly the product among his customers in legal standing when the breach occurs.

5. If, through lack of good faith, this is not done, the seller is liable for differences, at least to the extent of unfair delivery.

6. In determining apportionment, customers for each grade of coal should not be prorated with other customers of like grade, when such apportionment will lead to unfairness.

7. There must not only be fairness in apportionment among customers, but in producing the different grades.

8. The questions to be determined in such a case, is not what the seller may consider an economical use of its equipment in the production of grade coal, but what its contracts called for, in the light of the outside disturbance which forced restriction of effort.

9. While proration in given grades might be proper, it did not relieve the seller from producing as much of those grades as it could from the coal brought to the surface; he cannot withhold a certain amount of run-of-mine coal that should have been screened and selling at higher prices.

10. Prorate means to divide or share in proportion to the demand in the writing, considering all the conditions affecting the division at the time made.

11. If single contracts specify different grades, the quantity each is entitled to will be the tonnage divided by the number of grades purchased, unless a different division has been established by prior demand and practice between the parties or otherwise; proof of what had been done generally in previous years will therefore be of no assistance.

12. In a case against the seller to recover loss from insufficient and unfair delivery, it is error for the court to admit as substantial evidence a statement prepared by an expert accountant of the seller, offered to show a fair apportionment, where the statement was not made from the seller's books or records, but was a resumé of the testimony and the accountant's interpretation of the oral evidence and the contracts.

13. Such a statement with its conclusions and interpretations was a usurpation of the functions of the jury.

Argued May 4, 1926.    Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

Appeal, No. 12, March T., 1926, by plaintiff, from judgment of C. P. Allegheny Co., July T., 1921, No. 455, on verdict for plaintiff, in case of Diamond Alkali Co. v. Henderson Coal Co.    Reversed.

Assumpsit on coal contract.    Before DOUGLASS, J.

The opinion of the Supreme Court states the facts.

Verdict and judgment for plaintiff for $12,500.    Plaintiff appealed.

*Errors assigned* were various rulings and instructions, quoting record.

*George E. Shaw,* of *Reed, Smith, Shaw & McClay,* with him *William M. Robinson,* for appellant.—The burden is on the producer to establish not only the existence of causes beyond his control but also to show to what extent, if any, the effect of such causes prevented full performance: Delmont Gas Coal Co. v. Diamond Alkali Co., 275 Pa. 535; Detroit Edison Co. v. Coal Co., 295 Fed. 781.

The court below erroneously admitted in evidence statements prepared by an accountant determining the amount of coal to which appellant was entitled during the existence of causes beyond appellee's control, notwithstanding such statements were not a summary of anything appearing upon appellee's books or records but merely conclusions of the witness based on his construction of written instruments and his interpretation of oral testimony.

*Earl F. Reed,* of *Thorp, Bostwick, Stewart & Reed,* for appellee.—Testimony was admissible comparing the percentage of slack produced in the year of the contract to that produced in former years.

The schedules were properly admitted: Ehmling v. Ward Co., 279 Pa. 527; Phila. v. Neill, 211 Pa. 353; Cox v. Pottery Co., 38 Pa. Superior Ct. 545.

OPINION BY MR. JUSTICE KEPHART, June 26, 1926:

Appellant was a buyer of coal of various grades from appellee. It purchased 62,400 tons slack, 5,000 tons nut and 2,500 tons egg coal, delivery to be made during the year. The different grades were produced by screening run-of-mine coal. Appellee failed to deliver all the coal contracted for and this action for damages was brought in the court below by appellant, who recovered $12,500 on a claim of some $60,000.

The contract provided: "Deliveries of coal shall be subject to delays occasioned by strikes, lockouts, accidents and other unavoidable casualties in the operation of seller's mines, the want of car supply, the failure of the railway companies to deliver or place cars at the mines for loading, or other causes beyond the control of the seller. It is understood between the parties hereto that the seller will be obligated to deliver coal to other buyers and consumers, and if by reason of the causes above mentioned, or either or any of them, such total obligations exceed the total shipments from the seller's

mines, the seller may apportion among the buyer and other customers the coal it may be able to ship for the time being. And in the event of partial fulfillment of this contract as aforesaid, the buyer, without recourse, shall accept such an amount of coal as the seller may be able to supply under such apportionment."

Appellee claimed that production and shipment had been curtailed from October 1, 1916, for causes beyond its control, mentioned in the agreement.

There is no dispute as to the fact that these causes existed; the questions left open were their extent, and the good faith of appellee in production and in fair apportionment of the coal among all parties with whom it had contracts. Before a seller can justify failure to deliver, it must appear that the cause beyond its control contemplated by the contract prevented performance either partially or in full. Its mere existence does not suffice. Every reasonable effort must be made to overcome it before the cause may be used as an excuse, and then only to the extent to which it makes performance reasonably impossible. The burden is on the seller to establish all these factors and the extent, if any, to which they prevented performance: Delmont Gas Coal Co. v. Diamond Alkali Co., 275 Pa. 535; Detroit Edison Co. v. Main Island Creek Coal Co., 295 Fed. 781. When a party may discontinue performance for cause, it becomes the duty of the seller to apportion fairly the product among its customers in legal standing when the breach occurs. If through lack of good faith this is not done, the seller is liable for deficiencies, at least to the extent of unfair delivery: Acme Mfg. Co. v. Arminius Chemical Co., 264 Fed. 27; Consolidation Coal Co. v. Peninsular Portland Cement Co., 272 Fed. 625; Corona Coal Co. v. Robert P. Hyams Coal Co., 9 Fed. (2d Series) 361, 362.

Contract obligations in force on October 1, 1916, were submitted in evidence by appellee. Over objection, the quantity of run-of-mine coal screened during the period of appellant's contract and that screened during five

years prior thereto, was then proven to show appellee had been fair in apportioning its product. The admissibility of this evidence is here questioned.

The court below adopted the theory that customers for each grade should be prorated with other customers of like grade. Prorating was permitted when the causes specified arose. It became a very material question then as to whether appellee produced as much of a given grade as it could, or whether it sold run-of-mine coal in spot markets at a high cost during a time when it was advantageous to do so.

Appellee mined 334,000 tons. Of this 224,000 was screened, producing 87,000 tons slack, 6,200 nut and 6,000 egg. The unscreened run-of-mine amounted to approximately 110,000 tons. The practice in vogue prior to the contract under consideration would not aid in determining fairness in apportionment unless all conditions then existing were similar to those under investigation. There must not only be fairness in apportionment among the customers, but in producing the different grades.

Whether that practice would produce, during this contract, more screened coal, and leave the same run-of-mine, would not aid in determining whether appellee made its fullest effort to comply with its contracts. Appellee urged that screening all run-of-mine might result in a possible over-production of a certain grade. This excuse did not appear as a fact, and if it did, it would not relieve appellee from performance unless an unreasonable burden would have been imposed thereby. Then appellee abandoned grade production for run-of-mine at one or two of its mines, because it did not pay, or would disturb car supply. This could not legally be done to the detriment of its contract obligations, unless the deficiency in grade production was made up elsewhere. It could not throw the burden of such reduction on another mine already unable to cope with its obligations. The question was not what appellee might con-

sider an economical use of its equipment in the production of grade coal, but what its contracts called for, in the light of the outside disturbance which forced a restriction of effort.

While prorating in given grades may be the rule, it did not relieve appellee from producing as much of those grades as it could from the coal brought to the surface. It could not refuse to screen for the reasons given, nor could it load itself up with run of mine contracts by arbitrarily considering grade contracts as such, to the manifest prejudice of those or other contracts. Its conduct cannot be justified by showing the coal screened in other years was less than that in the present year, and on this showing claim it had performed its full duty to produce grade coal.

But appellant contends that little if any run of mine was sold on contracts, as no such run of mine contracts were offered in evidence. It concedes that if appellee had such obligations existing at the time the cause beyond control arose, it would have been required to use a fair proportion of the coal produced to supply the demand. Many were uncertain as to the quantity of the grade. Thus, Crystal Company tonnage called for 4″ lump, 1¼″, ¾″ egg, run-of-mine, nut or slack, while the Pittsburgh Water Company's was run-of-mine or slack. Some of these were considered run-of-mine contracts, but there was other evidence of such contracts. Appellee's general manager testified that 20,000 tons were delivered under the Page Company's contract, which, with others, totaled 27,000 tons so delivered. The Page contract called for 60,000 to 75,000 tons of ¾″ screened lump coal or run-of-mine coal. It received, according to counsel for appellee, some 55,000 tons of run-of-mine coal on a contract calling for ¾″ of run-of-mine.

There was no doubt difficulty in fairly apportioning these mixed contracts, and the operator's determination of the proper tonnage each contract should receive must

have considerable weight.  Nevertheless, if that determination be based on a manifest unfairness to certain contracts, good faith cannot be determined by showing that the same or less tonnage was screened in prior years.  Moreover, if what the operators did, as illustrated later, is the final word on good faith, the door would be opened to manifest unfairness.  Prorate means to divide or share in proportion to the demand in the writing, considering all the conditions affecting the division at the time made.  It contemplates an honest effort, accompanied by a reasonable show of doing all that was possible to meet the seller's engagements.  A rule or standard must exist which governs proration. Here contract requirements were to be divided among the various grades produced in proportion to the quantities called for in the contracts.  When single contracts specified different grades, the quantity each was entitled to would be the tonnage divided by the number of grades purchased, unless a different division had been established by prior demand and practice between the parties or otherwise.  Therefore what had been done generally in previous years would be of no assistance.

Another matter.  If the coal purchased took the place of coal that was produced by the operator and was equitably apportioned among the contracts, there is nothing to prevent the operator from taking from its production of run-of-mine an equal quantity and selling it.  But if there was no equitable apportionment of such coal, it would not excuse performance.  The operator cannot unjustly discriminate by withholding a certain amount of run-of-mine coal that should have been screened and selling it at higher prices.  We might pass this as harmless error, but, as the case was tried, there is another trial error of greater importance we will now consider.

The court below admitted in evidence a statement prepared by an expert accountant which fixed the tonnage appellant was entitled to receive under a fair apportionment during the existence of the causes beyond

appellee's control. This summary was not made from appellee's books or records but was a resumé of the testimony and the witness's interpretation of the oral evidence as well as all the contracts relating to the quantity the various customers were to receive of the different grades of coal. It is an attempt to justify the operator's acts. For illustration, as our question concerns mainly slack coal, the summary fixes, as its slack coal base in a mixed contract, the percentage of the given grade shipped. In other words, the operator alone determined the character of contract; if in an equally graded contract all shipments were slack, it was such contract. The statement further assumed the elements of good faith existed; it excluded contract requirements with respect to the different mines from which certain contracts were barred, and others were to be partially filled. All contracts were considered on the same basis to the disadvantage of appellant. An examination of the schedules in evidence shows plainly that they were based on conclusions to be drawn solely by the jury or involved mixed questions of law and fact. The statements were admitted as substantive proof and covered such a wide range that they should not have been received. It would be useless to mention all the matters included or considered by the witness which were properly for the jury.

We do not intend to depart from the rule in Ehmling v. D. L. Ward Co., 279 Pa. 527, that where certain facts may be ascertained by the examination of voluminous documents, a competent person may give a summary of their contents; a person skilled in science may give his opinion as to the inferences which may be drawn from the facts in evidence, as in Graham v. Pennsylvania Co., 139 Pa. 149. The exhibits in this case were inadmissible under either of these principles.

The witness undertakes to show what would have been a proper apportionment. Appellee, however, had no right to make any apportionment in the absence of the existence of causes beyond control, and then only during

the time these causes were present, facts clearly for the jury. The witness brushes over this by assuming their existence during the remainder of the term of the contract, although the evidence did not establish it. Evidence of embargoes, explosions in the mine, restrictions on consignees of one line of travel, and its effect, were not considered. These elements entered into fair apportionment, and did not affect all consumers alike. An embargo on one line was an embargo on all lines. But the summary carefully segregated appellee's contract liability for slack coal when there was an alleged impairment of appellant's credit, a fact to be found by the jury in reaching the tonnage appellant should receive. The question is similar to that passed on in Kelly v. Stevens, 58 Kan. 569, 50 Pac. 595, 597, where the "testimony was offered in the form of an exhibit purporting to cover substantially the whole subject of the controversy; it was altogether incompetent and inadmissible. This exhibit would be likely to and probably did appear to the jury as a summary of, and the most important item in, the testimony offered on behalf of the defendant. It probably had a controlling influence in fixing the amount of the verdict, and the error in its admission compels a reversal of the case." Neither the difficulties of the case nor the care used by the court in its charge to minimize the effect of the witness's conclusions can justify the usurpation of the function of the jury.

It might be entirely advantageous for counsel to submit in argument their version as to what was proper apportionment, but such statement, under these facts, cannot go to the jury as substantive proof in the case. We appreciate appellee's dilemma, but it is no more serious than that of appellant, who was compelled to go out into the open market and purchase coal; on the other hand it appears a great quantity of run-of-mine coal was sold by appellee in spot markets at very advantageous prices.

The assignments of error are sustained; the judgment is reversed and a venire facias de novo awarded.